# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-DR-00269-SCT

*TIMOTHY ROBERT RONK a/k/a TIMOTHY RONK*
*a/k/a TIMOTHY R. RONK*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/08/2010 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR PETITIONER: | GRAHAM PATRICK CARNER |
| | CAROL RENÉ CAMP |
| ATTORNEYS FOR RESPONDENT: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALLISON KAY HARTMAN |
| | ASHLEY LAUREN SULSER |
| | BRAD ALAN SMITH |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | POST-CONVICTION RELIEF DENIED - 01/11/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1. For his armed-robbery and capital-murder convictions, Timothy Robert Ronk was sentenced to thirty years in prison and death, respectively. ***Ronk v. State (Ronk I)***, 172 So. 3d 1112, 1121 (Miss. 2015). We affirmed. ***Id.*** And we later denied post-conviction relief. ***Ronk v. State (Ronk II)***, 267 So. 3d 1239, 1291 (Miss. 2019).

¶2. Now for a second time, Ronk seeks post-conviction relief through his Motion for Relief from Judgment or for Leave to File Successive Petition for Post-Conviction Relief.

His claims include that post-conviction counsel were ineffective.

¶3.    The State of Mississippi opposes relief and asks us to overrule *Grayson v. State*, 118 So. 3d 118 (Miss. 2013), to the extent *Grayson* held that ineffective-assistance-of-post-conviction-counsel claims are excepted from the bars in the Mississippi Uniform Post-Conviction Collateral Relief Act (UPCCRA). That exception must fall, the State says, based on our recent decision in *Howell v. State*, 358 So. 3d 613 (Miss. 2023). *Howell* overruled all cases in which we have held that Mississippi courts can apply "judicially crafted fundamental-rights exception[s]" to the UPCCRA's bars. 358 So. 3d at 615–16.

¶4.    Because *Grayson* crafted an ineffective-assistance-of-post-conviction-counsel exception to the UPCCRA's bars, we agree that *Howell* compels the partial overruling of *Grayson*. And we deny Ronk's request for post-conviction relief.

## FACTS AND PROCEDURAL HISTORY

¶5.    While extinguishing a house fire, firefighters found Michelle Lynn Craite's remains in the master bedroom. *Ronk I*, 172 So. 3d at 1121–22. Evidence showed that the fire was intentional. *Id.* at 1122. Craite's live-in boyfriend, Ronk, became the main suspect. *Id.* On the morning she died, he used her debit card. *Id.* And he had been using one of her cell phones to contact his online girlfriend, Florida resident Heather Hindall. *Id.* at 1123.

¶6.    After Ronk's arrest, he told Hindall that Craite was the aggressor. *Id.* In a letter to Hindall, he said that Craite "began slapping him and then approached him with a knife" after he told Craite that he was going to Florida. *Id.* He maintained that he never intended to kill Craite; rather, "he . . . stabbed her only after she threatened to shoot him." *Id.* "When I

2

realized what I had done," he said, "I cleaned the knife off, changed my clothes, doused the house with gasoline, set it on fire and drove off . . . ." *Id.* (alteration in original) (internal quotation marks omitted).

¶7. No weapons were found in Craite's home. *Id.* But two unloaded shotguns were found in a studio apartment behind her home. *Id.*

¶8. A jury convicted Ronk of armed robbery and capital murder with the underlying felony of arson. *Id.* at 1124. He was sentenced to thirty years in prison and death, respectively. *Id.*

¶9. In sentencing Ronk to death, the jury found that the mitigating circumstances failed to outweigh three aggravating circumstances: (1) "[t]he capital offense was committed while [Ronk] was engaged in the commission of [a]rson"; (2) "[t]he capital offense was committed by a person under sentence of imprisonment"; and (3) "[t]he capital offense was especially heinous, atrocious, or cruel." *Id.*

¶10. We affirmed. *Id.* at 1149. And we later denied post-conviction relief. *Ronk II*, 267 So. 3d at 1291.

¶11. In December 2019, Ronk petitioned the United States District Court for the Southern District of Mississippi for a writ of habeas corpus. In February 2021, the district court stayed those proceedings to allow him to return here and exhaust certain claims.

¶12. This successive post-conviction motion followed.

ANALYSIS

¶13.    Though Ronk proceeds under both Rule 60(b)(6) of the Mississippi Rules of Civil Procedure and the UPCCRA, the filing is a post-conviction motion subject to the UPCCRA. *See Knox v. State*, 75 So. 3d 1030, 1035 (Miss. 2011) ("A pleading cognizable under the UPCCRA will be treated as a motion for post-conviction relief that is subject to the procedural rules promulgated therein, regardless of how the plaintiff has denominated or characterized the pleading." (citing *Edmond v. Miss. Dep't of Corrs.*, 783 So. 2d 675, 677 (Miss. 2001))). Under the UPCCRA, relief is granted "only if the application, motion, exhibits, and prior record show that the claims are not procedurally barred and that they 'present a substantial showing of the denial of a state or federal right.'" *Garcia v. State (Garcia III)*, 356 So. 3d 101, 110 (Miss. 2023) (internal quotation marks omitted) (quoting *Ronk II*, 267 So. 3d at 1247; Miss. Code. Ann. § 99-39-27(5) (Rev. 2015)).

¶14.    The claims must be "procedurally alive." *Ronk II*, 267 So. 3d at 1247 (quoting *Neal v. State*, 525 So. 2d 1279, 1280–81 (Miss. 1987)). Capital cases have a one-year limitations period. Miss. Code. Ann. § 99-39-5(2)(b) (Rev. 2020). And successive writs are barred. Miss. Code. Ann. § 99-39-27(9) (Rev. 2020).

¶15.    To surmount those and any other bars, Ronk invokes three exceptions. The first is newly discovered evidence—i.e., "evidence, not reasonably discoverable at the time of trial, that is of such nature that it would be practically conclusive that, if it had been introduced at trial, it would have caused a different result in the conviction or sentence." Miss. Code Ann. § 99-39-27(9) (Rev. 2020); *see also* Miss. Code Ann. § 99-39-5(2)(a)(i) (Rev. 2020). Such

4

evidence is excepted from the time and successive-writ bars. Miss. Code. Ann. §§ 99-39-5(2)(a)(i), -27(9) (Rev. 2020).

¶16. Next is the fundamental-rights exception. Before *Howell*, "[e]rrors affecting fundamental constitutional rights" were excepted from the UPCCRA's bars. 358 So. 3d at 615 (internal quotation mark omitted) (quoting *Jones v. State*, 119 So. 3d 323, 326 (Miss. 2013)). But *Howell*, which handed down after Ronk filed this motion, overruled any case that "ha[s] held that the fundamental-rights exception can apply to the substantive, constitutional bars codified by the Legislature in the [UPCCRA]." *Id.* at 616. As a result, the fundamental-rights exception is inapplicable here. *See Gibson v. Bell*, 312 So. 3d 318, 324 (Miss. 2020) ("Generally, 'all judicial decisions apply retroactively unless the Court has specifically stated the ruling is prospective.'" (quoting *Mid-S. Retina, LLC v. Conner*, 72 So. 3d 1048, 1052 (Miss. 2011))).

¶17. Third and finally is *Grayson*'s ineffective-assistance-of-post-conviction-counsel exception. Based on *Howell*, the State asks us to overrule *Grayson* and abrogate that exception.

¶18. *Grayson* established that death-penalty petitioners' claims related to ineffective assistance of post-conviction counsel are unbarred. *Brown v. State*, 306 So. 3d 719, 748 (Miss. 2020) (citing *Grayson*, 118 So. 3d at 126). There, Grayson, a death-row inmate, filed a successive post-conviction motion, claiming that he was denied effective assistance of post-conviction counsel in initial post-conviction proceedings. *Grayson*, 118 So. 3d at 122, 125. Though the Court conceded that it "ha[d] not recognized a general right to the effective

assistance of PCR counsel in every criminal case[,]" it crafted an exception for death-penalty

petitioners:

> We have said that the death-penalty petitioner is "entitled to appointed *competent* and *conscientious* counsel to assist him with his pursuit of post-conviction relief." **Puckett** [**v. State**], 834 So. 2d [676,] . . . 680 [(Miss. 2002)] (emphasis added). Our laws provide that an accused shall have "representation available at every critical stage of the proceeding against him where a substantial right may be affected." Miss. Code Ann. § 99-15-15 (Rev. 2007). And because this Court has recognized that PCR proceedings are a critical stage of the death-penalty appeal process at the state level, today we make clear that PCR petitioners who are under a sentence of death do have a right to the effective assistance of PCR counsel. **Jackson v. State**, 732 So. 2d 187, 191 (Miss. 1999)[.]

*Id.* (footnote omitted). So the Court reached the merits of Grayson's claim but found it

lacking. *Id.* at 126, 147.

¶19. After **Grayson**, the State says it is now "the modus operandi of Mississippi's

death-eligible prisoners to claim **Grayson**'s right to PCR counsel has created a new cause of

action and means to litigate it in state court." In the United States District Court for the

Southern District of Mississippi, for example, the State says, "every death-eligible

prisoner—save one—who has requested a stay . . . on the basis of **Grayson**'s holding has

obtained at least one stay of his habeas proceedings."

¶20. Ronk fared the same. In staying his federal habeas corpus proceedings, the district

court said that

> after **Grayson** was decided, no claim of ineffective assistance of PCR counsel could be deemed exhausted in this Court unless the Mississippi Supreme Court had considered the issue. That being so, all of the capital habeas cases raising the issue of ineffectiveness of PCR counsel that were pending in this Court were stayed, so that the petitioners in those cases could return to state court to exhaust that issue. Even though some of the cases had been closed in state

court for some time, the Mississippi Supreme Court reviewed each one.

> . . . State law is clear . . . that no matter how slim his chances of success might be, Ronk has the right to raise this claim in state court.

Order Granting Motions to Stay and Abate, *Ronk v. Cain*, No. 1:19-cv-00346-HSO, at \*\*1–2 (S.D. Miss. Feb. 23, 2021) (citations omitted).

¶21.   In light of *Howell*, however, the State argues that *Grayson*'s right to the effective assistance of post-conviction counsel is no longer an exception to the UPCCRA's bars.

¶22.   *Howell* "overrule[d] [*Rowland v. State (Rowland I)*], 42 So. 3d 503 (Miss. 2010), [*Rowland v. State (Rowland II)*], 98 So. 3d 1032 (Miss. 2012), and any other case in which, and to the extent that, we ha[d] held that the fundamental-rights exception can apply to the substantive, constitutional bars codified by the Legislature in the [UPCCRA]." *Howell*, 358 So. 3d at 616. There, Howell had relied on the illegal-sentence fundamental-rights exception to surmount the UPCCRA's time bar. *Id.* at 615. But we deemed the UPCCRA's time bar substantive law, which, if constitutional, cannot be judicially amended or ignored. *Id.* at 615–16. So we "overrule[d] *Rowland I*, *Rowland II*, and any other case in which [we] ha[ve] held that the courts of Mississippi can apply the judicially crafted fundamental-rights exception to constitutional, substantive enactments of the Legislature . . . ." *Howell*, 358 So. 3d at 615 (citations omitted). At the same time, we "acknowledge[d] that other arguments may be used to attack the constitutionality of the statutory bars, either as applied to particular cases or on their face . . . ." *Id.* at 616.

¶23.   Because *Howell* supports that no judicially crafted exception—even for fundamental rights—applies to the UPCCRA's substantive, constitutional bars, we overrule *Grayson* to

the extent it crafted an exception for ineffective-assistance-of-post-conviction-counsel claims in death-penalty cases. To hold otherwise would be to "amend or ignore constitutionally sound law enacted by the Legislature[,]" which we cannot do. *Howell*, 358 So. 3d at 616. As in *Howell*, our holding does not foreclose the possibility that "other arguments or doctrines" might afford relief. *Id.*

¶24.  The dissent criticizes our holding as "violat[ing] the maxim that there "is no right without a remedy, for 'whensoever the law giveth any right, . . . it also giveth a remedy.'" Diss. Op. ¶ 135 (internal quotation marks omitted) (quoting *McInnis v. Pace*, 78 Miss. 550, 29 So. 835, 835 (Miss. 1901)). Indeed, "[t]he Mississippi Constitution provides that a remedy shall be available in the courts for every injury." *Robinson v. Stewart*, 655 So. 2d 866, 868 (Miss. 1995) (citing Miss. Const. art. 3, § 24). But generally speaking, "no right without a remedy" is just as the dissent puts it: a maxim or principle (albeit an important one), Diss. Op. ¶ 135 (quoting *McInnis*, 29 So. 835), "not an ironclad rule." Richard H. Fallon, Jr. Daniel J. & Meltzer, *New Law, Non-Retroactivity, and Constitutional Remedies*, 104 Harv. L. Rev. 1731, 1778 (1991) (stating that the "apparent promise of effective redress for all constitutional violations" set forth in *Marbury v. Madison*, 5 U.S. 137, 147, 2 L. Ed. 60 (1803), "reflects a principle, not an ironclad rule, and its ideal is not always attained[]"); *Webster v. Doe*, 486 U.S. 592, 613, 108 S. Ct. 2047, 2059, 100 L. Ed. 2d 632 (1988) (Scalia, J. dissenting) ("[I]t is simply untenable that there must be a judicial remedy for every constitutional violation."). And the Mississippi Constitution's Remedy Clause "erects no barriers against legislation." *Robinson*, 655 So. 2d at 869 (citing *Grimes v. Pearl River*

8

*Valley Water Supply Dist.*, 930 F.2d 441, 443–44 (5th Cir. 1991)). As examples, neither "limitations upon suits against government entities[,]" *id.* (citing *Wells v. Panola Cnty. Bd. of Educ.*, 645 So. 2d 883, 889 (Miss. 1994)), nor "other complete statutory bars to recovery" violate the remedy clause. *Id.* (citing *Anderson v. Fred Wagner & Roy Anderson, Jr., Inc.*, 402 So. 2d 320, 321–24 (Miss. 1981)). In the same way here, legislation (i.e., the UPCCRA) omits ineffective assistance of post-conviction counsel as an exception.

¶25.     Moreover, no federal constitutional right is at stake here. *Coleman v. Thompson*, 501 U.S. 722, 752, 111 S. Ct. 2546, 2566, 115 L. Ed. 2d 640 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings[.]"). And the state constitutional right's underpinnings are shaky. Mississippi alone recognizes a constitutional right to appointed counsel in state post-conviction proceedings. *Gibson v. Turpin*, 513 S.E.2d 186, 191–92 (Ga. 1999) ("[N]o state, save for Mississippi, has recognized a *constitutional* right to appointed counsel upon habeas corpus." (citing *Jackson v. State*, 732 So. 2d 187 (Miss. 1999)). And as *Jackson*'s special concurrence noted, the *Jackson* majority cited no authority for a right to post-conviction counsel in the Mississippi Constitution. *Jackson*, 732 So. 2d at 192 (Mills, J., specially concurring). "Such a post-trial right," Justice Mills said, "is constitutionally nonexistent . . . ." *Id.* He and the two Justices who joined him would have based indigent death-row inmates' right to post-conviction counsel on Mississippi Code Section 99-15-15, not the Mississippi Constitution. *See id.*

¶26.     Post-*Jackson*, *Puckett* added that death-row inmates are "entitled to appointed

9

*competent* and *conscientious* counsel to assist [them] with [their] pursuit of post-conviction relief." 834 So. 2d at 680 (emphasis added) (citing *Jackson*, 732 So. 2d 187).[1] *Grayson* then went even further, stating that "PCR petitioners who are under a sentence of death do have a right to the *effective assistance* of PCR counsel." 118 So. 3d at 126 (emphasis added) (citing *Jackson*, 732 So. 2d at 191). Per *Howell*, that was a bridge too far—i.e., the *Grayson* Court exceeded its bounds by judicially crafting an exception to the UPCCRA's substantive, constitutional bars.

¶27.    Nor is *Grayson* tenable. "[B]ecause . . . PCR proceeding*s* are a critical stage of the death-penalty appeal process at the state level," it said, "PCR petitioners who are under a sentence of death do have a right to the effective assistance of PCR counsel." *Grayson*, 118 So. 3d at 126 (emphasis added) (citing *Jackson*, 732 So. 2d at 191). At what post-conviction proceeding, then, does the right cease? The first? second? third? As one court put it: "A claim of ineffective assistance of the prior habeas counsel would simply be the gateway through which endless and repetitious writs would resurrect." *Graves*, 70 S.W.3d at 115. Whether Mississippi law should except ineffective-assistance-of-post-conviction-counsel claims from the UPCCRA's bars, as the dissent advocates, is a decision for the Legislature, not us. *See Howell*, 358 So. 3d at 615 ("[T]he Legislature only can enact substantive law . . . ."); *see also Graves*, 70 S.W.3d at 115 ("If the Legislature had intended ineffective

---

[1] "Competent counsel" could concern only initial appointment, not the end result. *See Ex parte Graves*, 70 S.W.3d 103, 114 (Tex. Crim. App. 2002) (defining the statutory right to competent counsel in state death-penalty habeas corpus proceedings to mean counsel's "qualifications, experience, and abilities at the time of his [or her] appointment" "rather than the final product of representation").

assistance of habeas counsel claims to be an exception to the bar on subsequent applications, it could have made that exception explicit just as it did with the three statutory exemptions that it specified.").

¶28.    While criticizing *Howell*, the dissent acknowledges that our partial overruling of *Grayson* flows from it. *See* Diss. Op. ¶ 143. To diverge and follow the dissent's path would be to ignore *Howell* and stray beyond our bounds. In forgoing that path, we stay within our bounds and break no new ground. *See Frazier v. State*, 303 S.W.3d 674, 680 (Tenn. 2010) (stating that Tennessee's statutory right to post-conviction counsel "does not . . . serve as a basis for relief on a claim of ineffective assistance of counsel in a post-conviction proceeding and does not include 'the full panoply of procedural protection that the Constitution requires be given to defendants who are in a fundamentally different position—at trial and on first appeal as of right'" (quoting *House v. State*, 911 S.W.2d 705, 712 (Tenn. 1995))); *Graves*, 70 S.W.3d at 117 (holding that Texas law "grants a statutory right to the appointment of competent counsel, but it does not give a habeas applicant a constitutional or statutory right to effective assistance of that counsel in the particular case that can form the basis of a subsequent writ"); *People v. Davis*, 619 N.E.2d 750, 756 (Ill. 1993) (holding that the defendant could not assert ineffective assistance of post-conviction counsel because post-conviction assistance of counsel created by statute "is not the assistance of counsel contemplated by the sixth amendment" (citing *People v. Flores*, 606 N.E.2d 1078, 1084 (Ill. 1992))); *State v. Gray*, 612 N.W.2d 507, 511 (Neb. 2000) (holding that because "[t]he Nebraska Constitution's provision for assistance of counsel in a criminal case is no broader

11

than its counterpart in the federal constitution[,]" "a prisoner cannot claim constitutionally ineffective assistance of counsel as a result of an attorney's service in a postconviction proceeding." (quoting *State v. Stewart*, 496 N.W.2d 524, 529 (Neb. 1993))); *see also Zebroski v. State*, 12 A.3d 1115, 1121 n.33 (Del. 2010) (noting that "[s]tates are divided on whether there is a postconviction right to the effective assistance of counsel under their respective rules, statutes or constitution" and collecting authorities).

¶29. Because we partially overrule *Grayson* here for the first time, we will address the merits of Ronk's motion. *Howell*, 358 So. 3d at 616–17 (addressing the petition's merits because the Court "announce[d] the partial overruling of *Rowland* . . . for the first time").

> *(1)    Ronk's claim that counsel were ineffective for failing to seek funds to hire an independent forensic pathologist to review Dr. Paul McGarry's autopsy report and to challenge his trial testimony is neither sufficient to surmount the bars nor satisfies the newly-discovered-evidence exception.*

¶30. Ineffective assistance of counsel is a two-part test that is hard to meet. *King v. State*, 23 So. 3d 1067, 1072 (Miss. 2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)); *see Moffett v. State*, 351 So. 3d 936, 945 (Miss. 2022) ("[S]urmounting *Strickland*'s high bar is never an easy task." (alteration in original) (internal quotation marks omitted) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 197, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011))).

¶31. First, counsel's performance must have been deficient—i.e., "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *King*, 23 So. 3d at 1072 (quoting *Strickland*, 466 U.S. at 687).

12

Performance is assessed using "an objective standard of reasonableness," with high deference to counsel and "a strong presumption" that counsel's conduct "fell within the wide range of reasonable professional assistance." *Garcia III*, 356 So. 3d at 111 (internal quotation mark omitted) (quoting *Ross v. State*, 954 So. 2d 968, 1003–04 (Miss. 2007)). "[E]very effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* (second alteration in original) (internal quotation mark omitted) (quoting *Strickland*, 466 U.S. at 689).

¶32.    Second, the deficiency must have prejudiced the defense—i.e., "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* (internal quotation mark omitted) (quoting *Strickland*, 466 U.S. at 677). A "reasonable probability" must exist that the trial result would have been different but for counsel's errors. *Id.* (quoting *Ross*, 954 So. 2d at 1003–04). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (internal quotation marks omitted) (quoting *Ross*, 954 So. 2d at 1004).

¶33.    "If a post-conviction claim fails on either of the *Strickland* prongs, the inquiry ends." *Williams v. State*, 722 So. 2d 447, 451 (Miss. 1998) (citing *Foster v. State*, 687 So. 2d 1124, 1130 (Miss. 1996)). And deficient performance need not be examined before prejudice. *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

¶34.    Here, Gordon Eric Geiss, Charles Stewart, Dawn Stough, and Matthew Busby

13

represented Ronk at trial, with Geiss serving as lead counsel. ***Ronk II***, 267 So. 3d at 1248. Ronk's post-conviction counsel were Mississippi Office of Capital Post-Conviction Counsel attorneys Louwlynn Vanzetta Williams, Alexander D. M. Kassoff, and Scott Johnson.

¶35.   Ronk argues that both sets of counsel were ineffective: trial counsel were ineffective for failing to seek funds to hire an independent forensic pathologist to review Dr. McGarry's autopsy report and to challenge his trial testimony, and post-conviction counsel were ineffective for neither investigating nor asserting trial counsel's ineffectiveness in that respect.

¶36.   Before ***Howell***, ineffective-assistance-of-trial-counsel claims could be excepted from the bars in "extraordinary circumstances." ***Chapman v. State***, 167 So. 3d 1170, 1173–74 (Miss. 2015). That is not so after ***Howell***. *See Howell*, 358 So. 3d at 616.

¶37.   So besides newly discovered evidence, Ronk's only procedurally alive claim is that post-conviction counsel were ineffective. Still, his ineffective-assistance-of-trial-counsel claim is relevant: Because his ineffective-assistance claims are layered, trial counsel's ineffectiveness is tied to post-conviction counsel's ineffectiveness. *See **Rippo v. State***, 423 P.3d 1084, 1098 (Nev. 2018) ("[W]hen a petitioner presents a claim of ineffective assistance of postconviction counsel on the basis that postconviction counsel failed to prove the ineffectiveness of his trial or appellate attorney, the petitioner must prove the ineffectiveness of both attorneys." (citing ***State v. Jim***, 747 N.W.2d 410, 418 (Nev. 2008))), *amended on denial of reh'g*, 432 P.3d 167 (Nev. 2018) (table).

¶38.   To surmount the bars, Ronk's ineffective-assistance-of-post-conviction-counsel claim

must have some arguable basis. *See Means v. State*, 43 So. 3d 438, 442 (Miss. 2010).

¶39. Turning to that inquiry, the underlying felony for his capital-murder charge was arson. *Ronk I*, 172 So. 3d at 1130. So the State had to "prove beyond a reasonable doubt that [he] killed Craite, without the authority of law, and with or without any design to effect her death, while he was engaged *in the commission* of the crime of arson." *Id.* at 1129–30 (emphasis added) (citing Miss. Code Ann. § 97-3-19(2)(e) (Rev. 2014)).

¶40. To prove that, Ronk says the State relied solely on its "star witness," Dr. McGarry. Though Dr. McGarry deemed "stab wounds of the back causing internal hemorrhage and collapse of the lungs" as the cause of death, he also said that Craite was burned alive.

¶41. When asked if there were any signs that she was alive during the fire, Dr. McGarry said that

> [s]he had burning and blistering of her lining of her mouth over her tongue down into her larynx, all the way down into her windpipe where the lining, the delicate tissue was blistered. The only way that happens is when very hot burning fumes are inhaled and eventually blister the lining of the respiratory track all the way down into the windpipe.

And he affirmed that there were signs of carbon monoxide in her body:

> Q. Was there any evidence from your observations during the autopsy of the presence of carbon dioxide in her body?
>
> [Dr. McGarry]. She had those -- her blood and the tissues that I examined had a bright cherry red color. This is the color of -- not carbon dioxide, but carbon monoxide, which is the product of burning of carbon monoxide material in a place that is for sometime closed such as a house fire. Where the burning of the inside of a house uses up the oxygen and then gives off carbon monoxide. The person who is still alive in the fire is trying to breathe and breathes in the carbon monoxide which causes their tissues and their blood to become bright red because of the presence of carbon monoxide combining with the hemoglobin of their blood and any tissues, and she showed

15

all of that indicating that she was, in spite of her wounds and her internal bleeding and her collapsed lungs, was still breathing and alive in the fire.

. . . .

Q. As part of conducting the autopsy do you take blood samples and ask the coroner to have those tested for the presence of carbon monoxide in her blood?

[Dr. McGarry]. Yes.

Q. Have you had occasion to review those?

[Dr. McGarry]. Yes.

Q. Do those results confirm your visual findings of the presence of that cherry red tissue samples?

[Dr. McGarry]. Yes.

Q. So in addition to what you saw her blood showed the presence --

[Dr. McGarry]. Actually contained a high level.

Q. High level of carbon monoxide.

¶42.    Absent any fire or medical treatment, Dr. McGarry said that Craite would have died "in minutes to an hour" after the stabbing. The stab injuries prevented her escape, he said. And she would have felt the "pain of her body being burned."

¶43.    On cross-examination, Geiss challenged whether Craite was conscious after the stabbing. Dr. McGarry said that "[a]ll of [his] findings indicated that she w[as] . . . ." "She did not have an injury that would make her unconscious," he said. "I would expect the stab wounds to affect her chest and for her to be mainly in trouble with bleeding and breathing, and her consciousness which is a function of the brain would still be intact."

16

¶44.    Geiss pressed on:

> Q. Maybe you're not getting my meaning. She was maybe alive but was she conscious?
>
> [Dr. McGarry]. I would expect her to be conscious.
>
> Q. Dr. McGarry?
>
> [Dr. McGarry]. Until she gets to the point where she has lost enough blood and where her respirations have been impaired enough that she would then go into shock and lose consciousness as she was dying, not at the beginning.
>
> Q. Dr. McGarry, if where they located her body was the same place the knife wounds had been inflicted would not indicate to you that she was, in fact, not conscious?
>
> [Dr. McGarry]. No.
>
> Q. The fact --
>
> [Dr. McGarry]. She is incapacitated. If she's incapacitated and can't do anything about it she doesn't have to be unconscious.

¶45.    Geiss then asked Dr. McGarry how Craite could have breathed with collapsed lungs.

Dr. McGarry explained that

> [a]s she is dying she is breathing, and in respiratory distress she's able to do some breathing, not adequate to oxygenate her tissues so she's incapacitated. She's making respiratory efforts but they are not normal, they are not effective, but she is breathing in some of the gas of the surrounding area and absorbing the carbon monoxide from that gas.

¶46.    Geiss posed "a simple chemistry question": Could the hot, expanding gas have caused "an intake of flame perhaps down a larynx?" Dr. McGarry said, "No." Instead, Dr. McGarry attributed the flame intake to "[b]reathing inward inhalation."

¶47.    Ronk says the State emphasized Dr. McGarry's testimony in its guilt- and penalty-

17

phase closing arguments. In its guilt-phase closing argument, it told that jury that

> you know from the testimony of Dr. McGarry that [Craite] was alive when the fire was set. He testified that she had carbon monoxide in her blood when he performed the autopsy. That her organs were that bright cherry red color. He did the test. And even more telling the inside of her mouth, her tongue and down her windpipe were burned from the heat of that fire. You know she felt pain, you know she was breathing.

> . . . .

> As to Dr. McGarry's credibility that is relevant. Not only did he find the cherry colored specimens of her blood, her organs, but the lab also confirmed independently of him there were high levels of carbon monoxide in her mouth and tongue and the throat, the tissues, the mucosa were burned. Not only did the heat and the smoke travel to her mouth and to her throat, it didn't stop there. It went into her lungs and was sufficiently metabolized through her lungs and heart that it went to her organs. . . . That's the proof before you, and it's not been contradicted.

¶48. And in its penalty-phase closing argument, the State urged the jury to

> [g]o back to the scene and think about what [Craite] felt as she fell to the floor. You know it was painful. You heard Dr. McGarry tell you that her lungs were collapsed and one hit an aorta.

> As she fell to the floor do you think she saw his feet walk away leaving the room? Do you think she saw his feet come back? Do you think she smelled the gasoline? Do you think she was terrified knowing that she could not get off the floor, that she could not get up? Do you think she heard the roar of the fire as it came racing down the hallway towards her? Don't forget the facts.

¶49. The State also relied on Dr. McGarry's testimony to support a sentencing instruction on the heinous, atrocious, cruel aggravator. *See* Miss. Code. Ann. § 99-19-101(5)(h) (Rev. 2007) (including whether "[t]he capital offense was especially heinous, atrocious or cruel" as an aggravating circumstance).

¶50. Then on direct appeal, Ronk says this Court repeatedly highlighted the significance

18

of Dr. McGarry's testimony for both the guilt and penalty phases:

- "[Dr. McGarry] noted that the stab wounds . . . incapacitated Craite so that she could not escape from the fire." *Id.* at 1121.

- "Dr. McGarry offered substantial evidence indicating Craite was still alive at the time of the fire, but was unable to escape due to her stab wounds. Faced with this evidence, a reasonable jury could find that Ronk killed Craite 'without the authority of law' while he was 'engaged in the commission of' an arson, as required by our capital-murder statute. Accordingly, we hold that the evidence presented was sufficient to sustain a conviction of capital murder with the underlying felony of arson." *Id.* at 1130 (citation omitted).

- "Dr. McGarry's testimony was relevant to proving the connection between Craite's death and the arson. During trial, part of Ronk's theory of defense was that Craite was already dead when he set her house on fire. Thus, Dr. McGarry's testimony had significant probative value in contradicting this assertion and supporting the State's theory that Ronk had committed capital murder during the commission of an arson." *Id.* at 1137.

- "[T]he State presented evidence through the testimony of Dr. McGarry that Ronk's knife severed a major artery in Craite's chest, punctured both her lungs, and pierced her liver, filling her chest and abdominal cavities with blood. He also explained that Craite was still alive and breathing during the fire; that she had suffered burning and blistering to the lining of her mouth, tongue, larynx, and windpipe; and that the fire had destroyed much of her flesh down to the bone. After stabbing Craite, Ronk had poured gasoline in the bedroom where she lay incapacitated, evincing his intent to destroy her body. According to Dr. McGarry, Craite would have been able to feel the pain of her body burning, but she was unable to escape due to her wounds." *Id.* at 1143.

¶51. Now, Ronk says Dr. McGarry was wrong. Specifically, Ronk alleges that Dr. McGarry falsely testified that Craite's blood had a high carbon-monoxide level and that she was burned alive. As support, Ronk offers an affidavit from forensic pathologist Dr. James R. Lauridson and highlights two excerpts.

19

¶52. First, Dr. Lauridson says the Garden Park Medical Center Laboratory Report (hereinafter, "the GPMC Report")—which trial counsel had—showed that Craite's "carboxyhemoglobin level was within normal limits":

> The [GPMC Report] reveal[s] that [Craite's] carboxyhemoglobin level was 5.5. Normal carboxyhemoglobin levels range anywhere from 0 percent to as high as 10 percent in smokers. *Ms. Craite's 5.5 carboxyhemoglobin level was within normal limits for the general population and was not an indication of exposure to smoke or products of combustion. Dr. McGarry's testimony that Ms. Craite's carboxyhemoglobin level was abnormally high was factually incorrect.*
>
> The only objective issue in the question of whether Ms. Craite was alive in the fire is the laboratory test indicating the level of carboxyhemoglobin measured in her blood by Garden Park Medical Laboratory, a level of 5.5%. This value must be viewed in context. Garden Park Medical Laboratory is a clinical laboratory and offers a reference value of 0.0 to 1.5% as guidance for physicians treating individual patients. The importance of a reported value depends entirely on individual circumstances and the population of subjects being tested. Thus, *to declare any value above 1.5% as "a high level" is an error and is misleading*.
>
> In the practice of forensic pathology, carboxyhemoglobin levels up to 10% are frequently seen in persons whose deaths were not associated with exposure to smoke or carbon monoxide. A common practice among forensic pathologists is to consider carbon monoxide as a factor in death associated in fire or smoke deaths only if the level of carboxyhemoglobin is above 10%. *See* W. Spitz, ed., *Medical Legal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation*, 762 (4th ed. 2006).

(Emphasis added.)

¶53. Second, Dr. Lauridson disputes that Craite was burned alive:

> Dr. McGarry's testimony that the blistering and burning which occurred in Ms. Craite's airway indicated she was still alive when Mr. Ronk set her house on fire was *highly subjective*. The deteriorated condition of Ms. Craite's airway can be attributed to the burned state of her body when it was found.
>
> To a reasonable degree of medical certainty, Ms. Craite's carboxyhemoglobin

level was within normal limits and *the burning and blistering that occurred in her airway can be attributed to the post-mortem burning of her body*. Ms. Craite died as a result of being stabbed by Mr. Ronk.

(Emphasis added.)

¶54. Ronk thus argues that trial counsel were ineffective. Their performance was deficient, he says, because they neither investigated the arson's connection to Craite's death—the most crucial, difficult aspect of the case—nor sought funds to hire an independent forensic pathologist. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.7, *reprinted in* 31 Hofstra L. Rev. 913 (2003) ("ABA Guidelines"). Though Geiss tried to challenge Dr. McGarry's opinions, Geiss lacked counter evidence. And without that, the State's "flawed and incorrect" forensic evidence went unchallenged.

¶55. Ronk likens his case to *Hinton v. Alabama*, 571 U.S. 263, 134 S. Ct. 1081, 188 L. Ed. 2d 1 (2014). There, the Supreme Court held that defense counsel was ineffective for inexcusably failing to know that more expert funding was available. *Id.* at 274–75. Expert consultation was essential in *Hinton* because that case turned on the State's expert witnesses' testimony on "firearms and toolmark" evidence. *Id.* at 265–66, 273 (internal quotation marks omitted). Defense counsel mistakenly believed that he was entitled to no more than $1,000 to hire an expert. *Id.* at 268. And that mistaken belief caused him to hire an inadequate expert. *Id.* at 268, 275. The Supreme Court held that counsel's "inexcusable mistake of law" constituted *Strickland* deficiency, so it remanded the case for consideration of *Strickland* prejudice. *Id.* at 275–76.

21

¶56. Ronk says his trial counsel, too, lacked a valid, strategic reason for not seeking funds to hire an independent forensic pathologist. Despite part of Ronk's defense theory being that Craite died before the fire was set, trial counsel unreasonably failed to hire an expert to advance that theory and counter Dr. McGarry. Ronk insists that the GPMC Report should have spurred trial counsel to use its results to seek funds to hire a forensic pathologist. *See Ruffin v. State*, 447 So. 2d 113, 118 (Miss. 1984) (stating that an indigent defendant's statutory "right to defense expenses . . . is conditioned upon a showing that such expenses are needed to prepare and present an adequate defense" (quoting *State v. Acosta*, 597 P.2d 1282, 1284 (Or. Ct. App. 1979)) (emphasis omitted)).

¶57. Had trial counsel presented counter evidence via expert testimony, Ronk maintains that more than a reasonable probability exists that the result would have been different. Dr. McGarry's "sensational yet flawed testimony," he says, "was seared into the jurors' brains" and led them to find that Craite was killed during the commission of arson. But if the fire was only incidental to the murder or if Craite died before it began, then the State could not prove an essential element—i.e., that she died during the course of arson. At minimum, then, counter expert testimony would have caused at least one juror to find him not guilty of capital murder. The same is true for the penalty phase. Busby believes "the jury was deeply affected by Dr. McGarry's testimony about Ms. Craite burning alive." Had jurors known the truth, however, Ronk says a reasonable probability exists that they would have imposed a lesser sentence.

¶58. Post-conviction counsel were ineffective too, he argues, for neither investigating nor

22

raising trial counsel's ineffectiveness in failing to seek funds to hire a forensic pathologist—even after *Ronk I* highlighted Dr. McGarry's importance. As a result, Ronk says false forensic evidence went unchallenged throughout trial, appellate, and post-conviction proceedings.

¶59. We find that this claim lacks an arguable basis and is insufficient to surmount the bars. Nor is the newly-discovered-evidence exception met.

¶60. "*Strickland* d[id] not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington v. Richter*, 562 U.S. 86, 111, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). "In many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Id.*

¶61. Here, Geiss challenged Dr. McGarry's opinions. Geiss questioned Craite's consciousness, asked how she could have breathed with collapsed lungs, and suggested that the hot, expanding gas caused the blistering and burning in her airway.

¶62. For Ronk to show that the lack of a counter expert prejudiced him, Dr. Lauridson's affidavit must rebut Dr. McGarry's testimony. *See Howard v. State*, 945 So. 2d 326, 352 (Miss. 2006) ("[I]n order for Howard to show that the result of the proceeding would have been different, he must offer an affidavit from an expert witness who rebuts the State's expert testimony."). Yet it falls short.

¶63. Because Mississippi follows the one-continuous-transaction doctrine, there is no reasonable probability that Dr. Lauridson's testimony would have spared Ronk from being

convicted of capital murder. That doctrine "applies to felony-murder cases and defines the causal nexus required between the killing and the underlying felony." ***Evans v. State***, 226 So. 3d 1, 35 (Miss. 2017) (citing ***Turner v. State***, 732 So. 2d 937, 950 (Miss. 1999)). "[A] killing occurring while engaged in the commission of one of the enumerated felonies," it says, "includes the actions of the defendant leading up to the felony, the attempted felony, and flight from the scene of the felony." ***Id.*** (internal quotation marks omitted) (quoting ***Turner***, 732 So. 2d at 950). Put differently, "where the two crimes . . . are connected in a chain of events and occur as part of the res gestae, the crime of capital murder is sustained." ***Id.*** (internal quotation marks omitted) (quoting ***Gillett v. State***, 56 So. 3d 469, 492 (Miss. 2010)).

¶64.    No matter the exact timing of Craite's death, the murder and arson were part of one continuous transaction. By Ronk's own account, he stabbed her, "cleaned the knife off, changed [his] clothes, doused the house with gasoline, set it on fire and drove off . . . ." ***Ronk I***, 172 So. 3d at 1123 (second alteration in original) (internal quotation mark omitted); *cf.* ***State v. Campbell***, 418 S.E.2d 476, 479 (N.C. 1992) (stating that the "murder and arson were clearly part of one continuous transaction" when evidence showed that the defendant "beat [the victim] to death with a crowbar, searched the house for valuables and then set the house on fire"). And the jury received an instruction on the one-continuous-transaction doctrine. ***Ronk I***, 172 So. 3d at 1129.

¶65.    Substantively, Dr. Lauridson offers counter testimony and evidence that Craite's "5.5 carboxyhemoglobin level was withing normal limits." But even if true, Dr. McGarry based

24

his opinion not only on the GPMC Report, but also on Craite's blood and tissues' "bright cherry red color." "The person who is still alive in the fire," he said, "is trying to breathe and breathes in the carbon monoxide which causes their tissues and their blood to become bright red because of the presence of carbon monoxide combining with the hemoglobin of their blood and any tissues . . . ."

¶66. As for the burning and blistering to Craite's airway, Dr. Lauridson's affidavit does not exclude her inhaling hot, burning fumes as a possible cause. He first says that "Dr. McGarry's testimony that the blistering and burning which occurred in Ms. Craite's airway indicated she was still alive when Mr. Ronk set her house on fire was *highly subjective.*" (Emphasis added.) "Highly subjective" does not equal false. And second, Dr. Lauridson says "the burning and blistering that occurred in [Craite's] airway *can be* attributed"—not *is* attributable—"to the post-mortem burning of her body." (Emphasis added.) "Can be" connotes possibility. *See United States v. Frazier*, 387 F.3d 1244, 1281 (11th Cir. 2004) (Tjoflat, J., specially concurring) ("'Can' necessarily connotes only a bare possibility (something over one percent), and though 'frequently' suggests something more, it does not connote 'usually' or 'most of the time' or in any way suggest that something happens 'more often than not.'").

¶67. So even though Dr. Lauridson surely *disagrees* with Dr. McGarry's opinion about the burning and blistering to Craite's airway and presents another possible cause, Dr. Lauridson does not *disprove* Dr. McGarry's opinion. Nor does Dr. Lauridson explain the rationale for his own theory about what caused the burning and blistering.

25

¶68. Moreover, Dr. Lauridson does not rebut Dr. McGarry's testimony that Craite could have lived up to an hour after the stabbing. "[S]he would have died without treatment in minutes to an hour," Dr. McGarry said. To have been alive during the fire, Craite would not have had to live long. She called someone at approximately 8:50 a.m.—near the time Ronk set the fire. By his own telling, he doused the home with gasoline, set it afire, and drove away. *Ronk I*, 172 So. 3d at 1123. Fifteen minutes from Craite's home is a Walmart, and the Walmart's ATM surveillance camera photographed Ronk at 9:05 a.m. Around 9:00 a.m., someone around the corner from Craite's home saw smoke. And police responded to the fire at 9:07 a.m.

¶69. Finally, even if Dr. McGarry's opinion about Craite's carbon-monoxide level were discredited and his causation theory concerning the burning and blistering to her airway were called into question, ample evidence still supported the heinous, atrocious, or cruel aggravator. At the very least, Craite suffered a painful, brutal stabbing and died helplessly alone. Or worse, adding to that, she stayed alive long enough to smell the gasoline, see or feel the flames, and breathe the fumes. Either way, the killing was heinous, atrocious, and cruel.

> (2) *Ronk's prosecutorial-misconduct claim is barred; his related ineffective-assistance-of-post-conviction-counsel claim is insufficient to surmount the bars; and the newly-discovered-evidence exception is unmet.*

¶70. Ronk argues that the State committed prosecutorial misconduct and violated his due-process rights by using Dr. McGarry's testimony—which it knew to be false—to secure the conviction. And Ronk argues that post-conviction counsel were ineffective for failing to investigate and raise this claim.

26

¶71. He cites *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). There, the Supreme Court reversed a conviction because known false testimony may have affected the outcome. *Id.* at 269, 272. A key witness in that case testified that he received no promise of consideration in return for his testimony. *Id.* at 265. That was false. *Id.* at 266–67. And the prosecutor's failure to correct that falsehood violated due process. *Id.* at 265. Had the jury known the truth, the Supreme Court said, it may have found that the witness lied to gain the prosecutor's favor. *Id.* at 270. "The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction," the Supreme Court explained, "does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Id.* at 269.

¶72. We find that the claims merit no relief. Prosecutorial-misconduct claims are not excepted from the UPCCRA's bars. *See Howell*, 358 So. 3d at 616. The ineffective-assistance-of-post-conviction-counsel claim lacks an arguable basis and is insufficient to surmount the bars. And the newly-discovered-evidence exception is unmet.

¶73. No *Napue* violation is shown. That requires a showing that "1) the testimony was actually false, 2) the state knew it was false, and 3) the testimony was material." *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014) (internal quotation marks omitted) (quoting *Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998)). As stated already, Dr. Lauridson's affidavit does not disprove all of Dr. McGarry's opinions. And even if it did, nothing shows that the State knew Dr. McGarry's opinions to be false. Still more, given our adherence to the one-continuous-transaction doctrine, there is no reasonable probability that

27

Dr. Lauridson's testimony would have affected Ronk's capital-murder conviction.

> (3)    *Ronk's claim that counsel were ineffective for failing to impeach Dr. McGarry's testimony about the carbon-monoxide level in Craite's blood and her being burned alive is neither sufficient to surmount the bars nor satisfies the newly-discovered-evidence exception.*

¶74.    "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

¶75.    Here, Ronk argues that trial counsel were ineffective for failing (1) to reasonably investigate Dr. McGarry and (2) to impeach his testimony with the GPMC Report. Ronk adds that post-conviction counsel were ineffective, too, for failing to investigate and assert trial counsel's ineffectiveness in those respects.

¶76.    First, Ronk says trial counsel shirked their duty to do a reasonable, independent investigation of Dr. McGarry. Had they done so, he says, they would have discovered not only Dr. McGarry's history of botched autopsies (discussed later) but also the falsity of his opinions. They may even have disqualified him as an expert.

¶77.    Second, Ronk says trial counsel failed to use the GPMC Report to impeach Dr. McGarry's opinions about the high carbon-monoxide level in Craite's blood and her being burned alive. Though Geiss tried to challenge how Dr. McGarry could possibly know that Craite was alive during the fire, Geiss offered no counter evidence.

¶78.    Ronk says Dr. McGarry's compelling (and essentially unchallenged) testimony significantly affected the jury. Without it, Ronk says, the State could not have obtained a death sentence. The State seized on Dr. McGarry's graphic imagery in its guilt- and penalty-phase closing arguments to sear Craite's awful fate into jurors' minds. And the State used the

28

same testimony to secure a jury instruction on the heinous, atrocious, cruel aggravator.

¶79. As support, Ronk cites four cases: *Foster v. Wolfenbarger*, 687 F.3d 702, 710 (6th Cir. 2012) (holding that trial counsel was ineffective for failing to investigate fully an alibi defense); *Elmore v. Ozmint*, 661 F.3d 783, 786, 851, 855, 861, 863 (4th Cir. 2011) (holding that trial counsel were ineffective for failing to investigate forensic evidence that was "obviously vital" to the prosecution's case, when post-conviction proceedings showed that an investigation would have raised many questions about the evidence's legitimacy and reliability); *Bell v. Miller*, 500 F.3d 149, 157 (2d Cir. 2007) (holding that "where the only evidence identifying a criminal defendant as the perpetrator is the testimony of a single witness, and where the memory of that witness is obviously impacted by medical trauma and prolonged impairment of consciousness, and where the all-important identification is unaccountably altered after the administration of medical drugs, the failure of defense counsel to consider consulting an expert to ascertain the possible effects of trauma and pharmaceuticals on the memory of the witness is constitutionally ineffective"); *Rolan v. Vaughn*, 445 F.3d 671, 674, 683 (3d Cir. 2006) (holding that trial counsel was ineffective for failing to investigate defense witnesses who would have supported the defendant's self-defense claim).

¶80. We find that this claim lacks an arguable basis and is insufficient to surmount the bars. Nor is the newly-discovered-evidence exception met.

¶81. Ronk's argument that post-conviction counsel were ineffective for failing to investigate Dr. McGarry (or to raise trial counsel's ineffectiveness for failing to do so) is

29

discussed later. Otherwise, trial counsel's failure to use the GPMC Report to impeach Dr. McGarry's testimony did not constitute *Strickland* prejudice or deficiency. Even if trial counsel had used the GPMC Report as Ronk proposes, a different conviction is not reasonably probable based on the one-continuous-transaction doctrine. And as the State notes, the GPMC Report flagged Craite's 5.5 "CARBOXY HGB" result as "CH." Though the meaning of "CH" is unclear, either the prosecution, Dr. McGarry, or both could have argued (as the State does here) that "CH" meant "Critical High." And as discussed already, the GPMC Report was not the only evidence relevant to whether Craite was alive during the fire.

> *(4)   Ronk's claim that the State suppressed material information about Dr. McGarry's past is barred; his related ineffective-assistance-of-post-conviction counsel claim is insufficient to surmount the bars; and the newly-discovered-evidence exception is unmet.*

¶82.   "[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." ***Brady v. Maryland***, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). A ***Brady*** violation requires proof

> (1) that the government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

***King v. State***, 656 So. 2d 1168, 1174 (Miss. 1995) (citing ***United States v. Spagnoulo***, 960 F.2d 990, 994 (11th Cir. 1992)).

30

¶83. Ronk argues that the State violated **_Brady_** by withholding material impeachment evidence about Dr. McGarry's termination from the Orleans Parish Coroner's Office and his history of botched autopsies. Post-conviction counsel were ineffective too, he argues, for failing to investigate and assert a **_Brady_** claim.

¶84. During Dr. McGarry's nearly thirty-year tenure with the Orleans Parish Coroner's Office, Ronk says Dr. McGarry's work came under fire in several cases. Five are discussed.

¶85. The first is Adolph Archie. Laura Maggi, _Orleans Parish coroner's office autopsies of some who died in police custody are questioned_, NOLA.com | The Times-Picayune (Jan. 30, 2011), https://www.nola.com/news/politics/orleans-parish-coroners-office-autopsies-of-some-who-died-in-police-custody-are-questioned/article_09a9ad1b-1cb1-5f2c-afe5-f0ae99d79428.html. In 1990, after fatally shooting a police officer, Archie was beaten by officers and later died. _Id._ Dr. McGarry deemed an accidental fall as the cause of death. _Id._ But independent autopsies found that Dr. McGarry missed injuries caused by blunt-force trauma. _Id._ After protests, the coroner's office changed Archie's cause of death to homicide by police intervention. _Id._

¶86. Second is Raymond Robair. Sergio Hernandez, _NOPD Officers Convicted in Handyman's Beating Death_, ProPublica (Apr. 13, 2011), https://www.propublica.org/article/nopd-officers-convicted-in-handymans-beating-death. Dr. McGarry deemed Robair's 2005 death accidental. _Id._ But another pathologist found that Dr. McGarry overlooked multiple injuries and that a beating had caused Robair's ruptured spleen. _Id._ That eventually led to criminal convictions for two police officers. _Id._

¶87.    Third is Gerald Arthur. A.C. Thompson, Mosi Secret, Lowell Bregman & Sandra Bartlett, *The Real CSI: How America's Patchwork System of Death Investigations Puts the Living at Risk*, ProPublica (Feb. 1, 2011), https://www.pbs.org/wgbh/pages/frontline/post-mortem/real-csi/. In 2006, Arthur died following a struggle with police officers. *Id.* Dr. McGarry deemed Arthur's death accidental. *Id.* But another pathologist found that Dr. McGarry missed injuries that suggested strangulation. *Id.* Arthur's family received a $50,000 settlement. *Id.*

¶88.    Fourth is Lee Demond Smith. A.C. Thompson, Mosi Secret, Lowell Bregman & Sandra Bartlett, *In New Orleans, Uncovering Errors and Oversights*, ProPublica (Feb. 1, 2011), https://www.npr.org/2011/02/01/133301618/in-new-orleans-uncovering-errors-and-oversights#:~:text=In%20New%20Orleans%2C%20Uncovering%20Errors%20and%20Oversights%20%3A%20NPR&text=In%20New%20Orleans%2C%20Uncovering%20Errors%20and%20Oversights%20In%20three%20instances,in%20to%20perform%20second%20autopsies. Smith died in jail, and Dr. McGarry's 2006 autopsy attributed Smith's death to pulmonary embolism. *Id.* But another specialist found injuries that Dr. McGarry missed and concluded that Smith was strangled. *Id.*

¶89.    Fifth and finally is Cayne Miceli. Gwen Filosa, *Cayne Miceli's death in jail restraints was not a crime, prosecutors say*, Times-Picayune (Dec. 8, 2011), https://www.nola.com/news/crime_police/cayne-micelis-death-in-jail-restraints-was-not-a-crime-prosecutor-says/article_118c6854-5663-5545-9b2a-1bbeaab5bf07.html#:~:text=%22Cayne%20Miceli's%20death%20was%20caused,office%20performed%20a%20thorough%20investigation.%22.

Miceli suffered from chronic asthma, depression, and panic attacks. *Id.* In 2009, she was arrested and jailed for disturbing the peace at a hospital. *Id.* While in jail, she was restrained to a metal bed. *Id.* After four hours, she went limp, was rushed to the hospital, and later died. *Id.* Dr. McGarry's autopsy attributed Miceli's death to drugs. Thompson, *supra*, *In New Orleans, Uncovering Errors and Oversights.* But in a second autopsy, Dr. Lauridson found that Miceli died from severe asthma combined with the jail restraints. *Id.* Miceli's family received a $600,000 settlement. Richard A. Webster, *Sheriff Marlin Gusman settles inmate death lawsuit for $600,000* (Oct. 17, 2014), https://www.nola.com/news/crime_police/ sheriff-marlin-gusman-settles-inmate-death-lawsuit-for-600-000/article_d56f1a47-7a11-5 d2b-af17-3cd90b6b4a44.html. According to Ronk, Miceli's case led to Dr. McGarry's being fired from the Orleans Parish Coroner's Office.

¶90.    Ronk likens his case to Miceli's. Dr. McGarry attributed her death to drugs even though a drug-and-alcohol screening showed neither in her blood. Thompson, *supra*, *In New Orleans, Uncovering Errors and Oversights.* Here, similarly, Dr. McGarry said that Craite was burned alive even though the carbon-monoxide level in her blood was within normal limits.

¶91.    Ronk accuses the State of failing to disclose Dr. McGarry's checkered past—despite defense counsel's pretrial discovery motion. At a pretrial motion hearing, the State represented that it "ha[d] provided everything in [its] file known to [it]." "[I]f other information becomes known as it relates to aggravating, mitigating, exculpatory, ***Brady*** information," it added, "of course, we have a continuing obligation to [disclose]." Yet Ronk

33

says it breached that obligation.

¶92.    Ronk maintains that suppressed evidence about Dr. McGarry's past is material for *Brady* purposes. Dr. McGarry's credibility was key—as Geiss knew. "If they [(the jury)] don't believe Dr. McGarry," Geiss said, "then they don't believe it's capital murder."

¶93.    Ronk likens his case to *Banks v. Dretke*, 540 U.S. 668, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004). There, the Supreme Court held that the prosecution violated *Brady* by suppressing that one key witness had been "intensively coached" and that another was a paid informant. *Banks*, 540 U.S. at 675, 698, 703. The suppressed evidence did not surface until federal habeas corpus proceedings. *Id.* at 675. "When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession," the Supreme Court said, "it is ordinarily incumbent on the State to set the record straight." *Id.* at 675–76.

¶94.    In response, the State insists that Mississippi Code Section 99-39-27(5) is unmet, and it discounts the news articles. It targets the *Robair* case specifically, highlighting that a third pathologist's findings and opinions aligned with Dr. McGarry's.  That assertion, notably, is based solely on the State's representation of information contained in an appellant's brief. Appellant's Brief, *United States v. Williams* (5th Cir. Apr. 12, 2012) (No. 11-30877), 2012 WL 1408709, at **10, 20, 22–23, 25–27, 29. Such document is neither provided nor accessible to us.  The State also says that the examiner who disputed Dr. McGarry's findings has since come under scrutiny.

¶95.    We find that the claims merit no relief. Even pre-*Howell*, Brady claims were not excepted from the UPCCRA's bars. En Banc Order, *Underwood v. State*, No. 2015-DR-

34

01378-SCT, at **6–7 (Miss. Dec. 16, 2021). The ineffective-assistance-of-post-conviction-counsel claim lacks an arguable basis and is insufficient to surmount the bars. And the newly-discovered-evidence exception is unmet.

¶96.    No *Brady* violation is shown. Nothing shows that the State possessed or controlled the evidence at issue. *See United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007) ("*Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess." (internal quotation mark omitted) (quoting *United States v. Beaver*, 524 F.2d 963, 966 (5th Cir. 1975))); *United States v. Delgado*, 350 F.3d 520, 527 (6th Cir. 2003) ("*Brady* does not apply to materials that are not 'wholly within the control of the prosecution.'" (quoting *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998))). Nor does anything show that Ronk could not have obtained the evidence himself with reasonable diligence. *See, e.g.*, *United States v. Dixon*, 132 F.3d 192, 199 (5th Cir. 1997) ("*Brady* does not obligate the government "to produce for [a defendant] evidence or information . . . that he could have obtained from other sources by exercising reasonable diligence." (first alteration in original) (quoting *Brown v. Cain*, 104 F.3d 744, 750 (5th Cir. 1997))); *Spirko v. Mitchell*, 368 F.3d 603, 610 (6th Cir. 2004) ("[T]he *Brady* rule does not apply if the evidence in question is available to the defendant from other sources[.]" (internal quotation marks omitted) (quoting *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir. 1990))); *United States v. Rodriguez*, 162 F.3d 135, 147 (1st Cir. 1998) ("The government has no *Brady* burden when the necessary facts for impeachment are readily available to a diligent defender . . . ." (citing *Lugo v. Munoz*, 682 F.2d 7, 9 (1st Cir. 1982))). Although

"***Brady*** held that the '[g]overnment may not properly conceal exculpatory evidence from a defendant, it does not place any burden upon the [g]overnment to conduct a defendant's investigation or assist in the presentation of the defense's case.'" ***United States v. White***, 970 F.2d 328, 337 (7th Cir. 1992) (alterations in original) (quoting ***United States v. Marrero***, 904 F.2d 251, 261 (5th Cir. 1990)). Here, Ronk had ample time to investigate and even interview Dr. McGarry: No fewer than three times before trial, including about eight months beforehand, the State disclosed Dr. McGarry as a potential witness.

> (5) *Ronk's claim that counsel were ineffective for failing to investigate Dr. McGarry's past and to impeach his testimony is neither sufficient to surmount the bars nor satisfies the newly-discovered-evidence exception.*

¶97.    Ronk argues that both trial and post-conviction counsel were ineffective for failing to investigate Dr. McGarry's past—specifically, his tarnished tenure with the Orleans Parish Coroner's Office and history of botched autopsies—and to then impeach his testimony with that information. Busby admits that no one investigated Dr. McGarry's past. As a result, Ronk says Dr. McGarry was able to impress the jury with his board certification and vast experience (more than 13,000 autopsies) without trial counsel challenging his qualifications or highlighting his checkered past.

¶98.    We find that this claim lacks an arguable basis and is insufficient to surmount the bars. Nor is the newly-discovered-evidence exception met.

¶99.    Even if Dr. McGarry's testimony deeply affected the jury (as Busby says) and impeachment evidence had tarnished Dr. McGarry's credibility in jurors' eyes, a different result is not reasonably probable.

¶100. At the time of Ronk's trial, Dr. McGarry had been qualified as an expert in "[s]everal hundred" cases. News articles alone are insufficient to show that Dr. McGarry should have been disqualified and that Ronk's capital-murder conviction and death sentence should be set aside. *See **Wilson v. State***, 21 So. 3d 572, 588–89 (Miss. 2009) (stating that news articles alone were insufficient to show that the petitioner's due-process rights were violated and that his death sentence should be set aside merely because forensic pathologist Dr. Steven T. Hayne testified).

¶101. No doubt, the news articles are mostly critical of Dr. McGarry. But not fully. One, for example, says, "Some in the field champion McGarry, praising his track record." Thompson, et al., supra, *The Real CSI.* Among them is James Traylor, a forensic pathologist at the LSU Health Sciences Center in Shreveport, LA, who was trained by and worked alongside Dr. McGarry. ***Id.***; Maggi, *supra*, *Orleans Parish coroner's office autopsies of some who died in police custody are questioned.*

¶102. Moreover, the evidence of guilt was overwhelming, ***Ronk II***, 267 So. 3d at 1284 (noting the "overwhelming evidence"), leaving Ronk unable to show ***Strickland*** prejudice. *See **Morales v. Ault***, 476 F.3d 545, 551 (8th Cir. 2007) (stating that prejudice cannot be shown if the evidence of guilt is overwhelming (citing ***Reed v. Norris***, 195 F.3d 1004, 1006 (8th Cir. 1999))). Even with an impeached Dr. McGarry, there is still the one-continuous-transaction-doctrine hurdle, plus ample evidence that the killing was heinous, atrocious, and cruel.

    *(6)    Ronk's claim that counsel were ineffective for failing to further investigate the details of Craite's prior assault-and-battery conviction*

*and to present evidence of her criminal history as support for their defense theory is neither sufficient to surmount the bars nor satisfies the newly-discovered-evidence exception.*

¶103. Ronk says trial counsel *tried* to argue self-defense. In his opening statement, Geiss alluded to self-defense but did not say that was the defense's theory of the case. "[O]ur defense," he said, "is actually based on a legal claim on what you will be instructed insofar as the law goes when it's all over."

¶104. Earlier, the State had orally moved to prevent Ronk's counsel from referencing Craite's prior domestic-violence incident. Pretrial discovery showed that Craite had once been arrested in Michigan "for some type of domestic violence involving a firearm" and that she had possibly received a year of probation. Geiss reassured both the trial court and the State that the defense did not intend to discuss that. True to his word, they never did.

¶105. Exhibit 7 to Ronk's post-conviction motion includes a 2003 Michigan felony complaint against Craite, alleging that she shot at her then husband. She pleaded guilty to assault and battery and was sentenced to one year of probation.

¶106. Yet despite Craite's criminal past, Ronk says the only self-defense evidence at trial came from the State's questioning of Hindall. Hindall said, "[Ronk] told me that [Craite] attacked him while he was trying to leave[,] . . . [and] he fought back because she was going for a shotgun in the house."

¶107. Ronk received jury instructions on self-defense and the lesser-included offense of murder. But he complains that Geiss made conflicting statements in closing arguments. On one hand, Geiss framed Craite as the aggressor. "[Craite] became irate, . . . attacked [Ronk],"

Geiss said. But then shortly after that, Geiss undermined the self-defense theory:

> We are hard pressed to tell you this is a good solid self-defense case, but we don't have to prove that. It's rather the State's burden to prove that there was not self-defense, and I don't think they have put up anything that says this was not self-defense. All that we have are what [Ronk] himself has told everyone from the beginning, and told them over and over again. That [Craite] attacked him, he thought she was going for the shotgun, which he thought was in the bedroom closet, and so he stabbed her.

Ronk says that simply teed up his self-defense theory for the State to crush in its rebuttal:

> This was not done in necessary self-defense. Did you hear where the stab wounds were? They were in her back. Think of a self-defense. Think of what you consider in your common experience as a -- thinking of things in your life's experiences, a self-defense case is not a stab wound three times in the back and then covering the house with gasoline. And the defense wants to make you think this is self-defense because of the information we received through [Hindall] through [Ronk] that he thought [Craite] was going to get a gun. Try to compare that to what the physical evidence, not what the skewed self-serving statements are, the physical evidence.
>
> What did we find out about a gun in the house? . . . [T]he crime scene specialist from the Biloxi [Police Department][] said there were a couple of guns. We did find some. They were in a separate detached studio apartment, they were unloaded, and they were in cases. If there were two, I remember one, there might have been two. The separate detached studio apartment. So think of this as reasonable because self-defense has to be reasonable. She would have to have left the bedroom, traveled down the hall, through the kitchen, out the door to the studio apartment, get the gun, open the box, load it up, come back, and then proceed to try to shoot [Ronk]. That's about as unreasonable as the sun rising in the west.

¶108. Here, Ronk argues that evidence concerning Craite's prior assault-and-battery conviction would have strengthened the credibility of his version of events by showing that Craite's domestic-violence history gave him reason to fear her. The jury, then, would have had a basis for finding that she was the initial aggressor and that he acted reasonably in self-defense.

39

¶109. So Ronk contends that trial and post-conviction counsel were ineffective for neither investigating Craite's past nor obtaining a copy of her prior assault-and-battery conviction.

¶110. We find that this claim lacks an arguable basis and is insufficient to surmount the bars. Nor is the newly-discovered-evidence exception met.

¶111. Craite's prior crime would have been relevant and admissible only if Ronk knew about it. *See Richardson v. State*, 147 So. 3d 838, 842 (Miss. 2014) ("[E]vidence showing [the defendant's] *knowledge* of [the victim's] prior violent criminal history was quite clearly relevant under [Mississippi] Rule [of Evidence] 401's standard and admissible under the standards of [Mississippi] Rule [of Evidence] 404(a)(2) and Rule 404(b)." (emphasis added)); *Jordan v. State*, 211 So. 3d 713, 717 (Miss. Ct. App. 2016) ("Evidence of prior violent acts of the victim, *when known to the defendant*, are . . . relevant and admissible under Rule 404(b) to show the defendant's state of mind at the time of the incident and the reasonableness of his use of force." (emphasis added) (citing *Richardson*, 147 So. 3d at 842)); *Sheffield v. State*, 844 So. 2d 519, 522 (Miss. Ct. App. 2003) ("[I]t is essential that the proper predicate be laid for the admissibility of evidence of the victim's propensity for violence, *i.e.*, that the defendant was *actually aware* of the victim's character so that this prior knowledge colored the defendant's decision regarding the necessity of violent physical effort to avoid an anticipated attack." (emphasis added)). At least some evidence shows he did. In a pretrial psychological evaluation, Ronk said that "he knew [Craite] was serious [about getting a gun and shooting him] because she had previous charges for aggravated assault and shooting her husband."

¶112. But even if Ronk knew about Craite's prior crime and that evidence had been admitted, there is still no reasonable probability of a different result.

> The plea of self-defense must be supported by evidence of facts and circumstances from which the jury may conclude that a defendant was justified in having committed the homicide because he was, or had reasonable grounds to believe that he was, in *imminent danger* of suffering death or great bodily harm at the hands of the person killed.

*Willis v. State*, 352 So. 3d 602, 616 (Miss. 2022) (emphasis added) (quoting *Strong v. State*, 600 So. 2d 199, 203 (Miss. 1992)). Imminent danger is "an immediate threat to one's safety that justifies the use of force in self-defense—The danger resulting from an immediate threatened injury sufficient to cause a reasonable and prudent person to defend himself or herself." *Wells v. State*, 233 So. 3d 279, 285 (Miss. 2017) (internal quotation marks omitted) (quoting *Imminent danger*, Black's Law Dictionary (10th ed. 2014)). And *immediate* means "occurring without delay; instant[.]" *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Immediate*, Black's Law Dictionary (10th ed. 2014)). But in Ronk's case, immediacy was lacking: No weapons were found inside Craite's home, and Ronk stabbed her in the back multiple times. *Ronk I*, 172 So. 3d at 1121, 1123, 1133, 1148.

> (7) *Ronk's claim that counsel were ineffective for failing to seek funds to hire a neuropsychologist to present mitigating evidence of his history of neurological dysfunction, bipolar disorder, and attention deficit with hyperactivity disorder (ADHD) is neither sufficient to surmount the bars nor satisfies the newly-discovered-evidence exception.*

¶113. Ronk argues that trial and post-conviction counsel were ineffective for failing to seek funds to hire a neuropsychologist to explain that his crime was not a willful, "pure[ly] evil" choice.

¶114. Pretrial, the trial court granted defense counsel's motion to hire Dr. Beverly Smallwood to evaluate Ronk "to determine whether he knew right from wrong at the time of the alleged incident, whether he [wa]s competent to assist counsel in the trial of his case and, whether or not a psychological evaluation would reveal any mitigating circumstances." She did so and was his only penalty-phase witness. She testified that he had (a) the competency to stand trial and assist defense counsel; (b) mental disorders that did not prevent him from distinguishing right from wrong; and (c) an above-average IQ.

¶115. Ronk says her testimony proved "extremely damaging." He reasons as follows. Of the eight malingering subtests she administered, she found that he "probably feign[ed]" (i.e., "exaggerat[ed] psychological symptoms") on two and was "in the indeterminate range" (i.e., "kind of borderline between probable and honest") on four. Based on his mental-health records, she agreed with the bipolar-disorder and ADHD diagnoses. But after discussing his resentment about being adopted, suicide attempts, impulsive behavior, and drug-and-alcohol abuse, she added a diagnosis independent from his records: "a conduct disorder." That then enabled her on cross-examination to diagnose him with antisocial personality disorder.

¶116. Ronk says the State seized on that in its closing arguments:

> [Ronk] can't blame his childhood, he can't blame his bipolar or his ADHD.
>
> . . . .
>
> Evil does exist in this world, and I submit to you that there's no other explanation for such a horrific crime than pure evil.
>
> . . . .
>
> Someone years back diagnosed him as ADHD and bipolar. Well [Dr.

42

Smallwood] agreed with me that that's a classic clear example of someone who has antisocial personalty disorders. And in my inability to talk to her on the same level I said is that the same thing as sociopathic, and she agreed. And that's the same kind of recklessness and indifference to the value of human life, impulsiveness that landed us in this courtroom and landed . . . Craite deceased. Take that into consideration please. Don't allow bad childhood to be a crutch.

¶117. Ronk argues that the frontal-lobe problems documented in his records should have prompted defense counsel to seek funds to hire a neuropsycholgist. *See **Caro v. Woodford**,* 280 F.3d 1247, 1255–56 (9th Cir. 2002) (stating that blood tests and "Caro's extraordinary history of exposure [to pesticides and toxic chemicals] should have prompted counsel to ask an expert about the risks of Caro's chronic exposure"). As support, he offers an affidavit from neuropsychologist Dr. Robert G. Stanulis.

¶118. Dr. Stanulis says Ronk's documented frontal-lobe problems should have alerted Dr. Smallwood to the need for a full neuropsychological evaluation:

> Dr. Smallwood . . . testified that Mr. Ronk had not been "overcome by some kind of organic mental disorder or anything like that." Dr. Smallwood's concession is puzzling given Mr. Ronk's history of "frontal lobe problems" and impulsive behavior. Dr. Smallwood did not address these issues in her evaluation. ADHD is a frontal lobe problem and Bipolar Disorder is a biochemical disorder. Failure to address the neuropbiological underpinnings of Mr. Ronk's diagnoses is puzzling given that the question about "organic mental disorder" usually means biological dysfunction of the brain.
>
> [N]o forensic psychologist or neuropsychologist evaluated Mr. Ronk. . . .
>
> Records that were provided to Dr. Beverly Smallwood prior to her evaluation of Mr. Ronk revealed that Mr. Ronk's long history of impulsive behavior and frontal lobe problems should have alerted her that he needed a neuropsychological evaluation. Specifically, in his June 15, 1998 Discharge Summary from Mountainside Hospital, Dr. Edward Latimore stated that "much of his [Mr. Ronk's] impulsive behavior is rooted in his manic depressive illness, and that he has to stay on medications or else he will certainly

43

decompensate again and become unruly, etc." A progress note from Gulfport Memorial Hospital dated January 2, 2008 documented Mr. Ronk's history of "frontal lobe problems."

The combination of Mr. Ronk's inability to maintain control of his actions if unmedicated combined with his history of frontal lobe problems warranted a complete neuropsychological workup to determine the extent to which he was responsible for his actions. Frontal lobe dysfunction is well known to cause a lack of behavioral control and problems in the appreciation of the consequences of one's actions, which courts have recognized as significant mitigating evidence to reduce criminal culpability and to justify a sentence less than death.

. . . .

A thorough evaluation of Mr. Ronk's thinking and feelings at the time of the instant offense is required to assess to what degree his actions were or were not a mere behavioral choice. While extreme emotional distress or a lack of substantial capacity to conform his conduct to the requirements of the law would not qualify as an insanity defense in Mississippi, they would negate the prosecution's argument that the commission of the crime was just a behavioral choice and could be seen by the jury as mitigating. Assessing Mr. Ronk's active symptoms at the time of the instant offense is critical to understanding the extent to which his actions were or were not a mere behavioral choice.

Mr. Ronk did not undergo a thorough forensic psychological or neuropsychological evaluation. The biological underpinnings of his diagnoses were not explained to the jury. While legal insanity was ruled out, an evaluation to assess the role of his multiple diagnoses in the instant offense was not performed. The fact that Mr. Ronk was being medicated to control his otherwise uncontrollable impulses and emotions was not presented to the jury. The role of ADHD and Bipolar Disorder in his criminal history was not assessed or explained to the jury. In addition, Dr. Smallwood's evaluation of Mr. Ronk was not informed by a full mitigation investigation, so the jury did not have the benefit of that information when deciding his sentence.

¶119. Ronk says a qualified neuropsychologist (like Dr. Stanulis) would have educated the jury that Ronk's crime was "a manifestation of behavior he could not control rather than 'pure evil' or a 'choice.'" And had the jury known that, more than a reasonable probability

exists that the result would have been different. The information would have supported two mitigators: (1) that Ronk acted "under the influence of extreme mental or emotional disturbance" and (2) that his "capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." Miss. Code. Ann. § 99-19-101(6)(b), (f) (Rev. 2007).

¶120. Ronk argues that trial counsel had no strategic reason for failing to hire a neuropsychologist. Busby says Dr. Smallwood was hired simply because she was the public defender's office's "go to" mental-health expert. But by Dr. Smallwood's own admission, a mitigation investigation fell outside of her expertise. *Ronk II*, 267 So. 3d at 1261.

¶121. Post-conviction counsel did retain neuropsychiatrist Dr. Shawn Agharkar. Yet Dr. Stanulis says, "Dr. Agharkar did not finish his evaluation nor did he administer any neuropsychological testing . . . ."

¶122. We find that this claim lacks an arguable basis and is insufficient to surmount the bars. Nor is the newly-discovered-evidence exception met.

¶123. Ronk mainly faults Dr. Smallwood. *She* failed to address "the neurobiological underpinnings" of Ronk's diagnoses, Dr. Stanulis says. And he says medical records "should have alerted *her* that [Ronk] needed a neuropsychological evaluation." (Emphasis added.)

¶124. But Ronk "[wa]s not entitled to effective assistance of an expert." *Garcia III*, 356 So. 3d at 119 (citing *Brown v. State*, 798 So. 2d 481, 499 (Miss. 2001)).

¶125. No psychological expert is infallible. *Garcia v. State (Garcia IV)*, 369 So. 3d 511, 521 (Miss. 2023) (quoting *Doss v. State*, 19 So. 3d 690, 714 (Miss. 2009)). Nor must trial counsel

"always go behind the retained psychological expert and question whether there are additional diagnoses defense counsel should pursue." *Id.* at 523 (citing *Garcia III*, 356 So. 3d at 112–13). "[W]hen 'defense counsel has sought and acquired a psychological evaluation of the defendant . . . , counsel generally will not be held ineffective for failure to request additional testing[.]'" *Id.* (second alteration in original) (internal quotation marks omitted) (quoting *Garcia III*, 356 So. 3d at 112).

¶126. It was not unreasonable for Ronk's trial and post-conviction counsel to rely on their experts. *See Garcia III*, 356 So. 3d at 112–14 (finding that trial counsel was not deficient for failing to glean from sources, including expert evaluation, that the defendant may suffer from fetal alcohol syndrome disorder (FASD) when neither the sources nor the expert report indicated that the defendant suffered from FASD); *Clark v. Mitchell*, 425 F.3d 270, 285 (6th Cir. 2005) ("It was not unreasonable for [petitioner's] counsel, untrained in the field of mental health, to rely on the opinions of [retained psychological and psychiatric experts]."); *Wyatt v. State*, 71 So. 3d 86, 110 (Fla. 2011) ("[D]efense counsel is entitled to rely on the evaluations conducted by qualified mental health experts, even if, in retrospect, those evaluations may not have been as complete as others may desire." (internal quotation mark omitted) (quoting *Reese v. State*, 14 So. 3d 913, 918 (Fla. 2009))); *see also Segundo v. Davis*, 831 F.3d 345, 352 (5th Cir. 2016) ("Counsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses without worrying that a reviewing court will substitute its own judgment, with the inevitable hindsight that a bad outcome creates, and rule that his performance was substandard for doing so." (internal

quotation marks omitted) (quoting *Smith v. Cockrell*, 311 F.3d 661, 676–77 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004))). Because those experts did not suggest that a "forensic psychological or neuropsychological evaluation" was needed, counsel were not ineffective for failing to find otherwise. *See Clark*, 425 F.3d at 286 (holding that "counsel was not ineffective for failing independently to discover the need for additional neurological testing" because "[n]either expert concluded that [the petitioner] suffered from organic brain damage, nor did either suggest that [he] needed further neurological testing"); *Stokley v. Ryan*, 659 F.3d 802, 813 (9th Cir. 2011) ("[N]either of the experts counsel hired unequivocally stated that [the petitioner] should be examined by a neuropsychologist—and counsel was under no obligation to seek neuropsychological testing in the absence of any such recommendation." (citing *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998))).

¶127. What is more, Dr. Smallwood discussed Ronk's capacity to control his behavior. When asked about Ronk's ability to control his impulsivity, she answered, "[T]he presence of the bipolar disorder and ADHD, which he has, would make it much more difficult for him to control than the average person." Still, she did not find that he had "a mental disorder that overpowered his will to the point that he did not know right from wrong."

¶128. Portraying Ronk's behavior as beyond his control is not necessarily mitigating anyway. *See Foster v. Schomig*, 223 F.3d 626, 637 (7th Cir. 2000) ("Sentencing judges 'may not be impressed with the idea that to know the cause of viciousness is to excuse it; they may conclude instead that when violent behavior appears to be outside the defendant's power of

control, capital punishment is appropriate to incapacitate." (quoting *Burris v. Parke*, 130 F.3d 782, 784–85 (7th Cir. 1997))).

*(8)    Cumulative error does not merit relief.*

¶129. Ronk says *Ronk II* was far from clear cut. For one, the Court described Geiss's "illnesses and prescription-drug use" as "troubling." *Ronk II*, 267 So. 3d at 1256. And it said that "[trial] counsel's mitigation investigation arguably was deficient." *Id.* at 1273. Still more, three Justices would have granted Ronk leave to seek post-conviction relief in the trial court on whether counsel were ineffective during the penalty phase. *Id.* at 1291–92 (Coleman, J., concurring in part and dissenting in part, joined by Kitchens, P.J., and King, J.).

¶130. So Ronk contends that the cumulative effect of *Ronk II*'s findings and the claims raised here merit relief.

¶131. We find that cumulative error does not merit relief.

## CONCLUSION

¶132. Based on *Howell*, *Grayson* is overruled to the extent it excepted ineffective-assistance-of-post-conviction-counsel claims from the UPCCRA's bars in death-penalty cases. And Ronk's post-conviction motion is denied.

¶133. **POST-CONVICTION RELIEF DENIED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, BEAM, AND CHAMBERLIN, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., AND ISHEE, J.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶134. Respectfully, I dissent. In *Grayson v. State*, 118 So. 3d 118, 128 (Miss. 2013), this

Court correctly held that a claim of ineffective assistance of post-conviction counsel is exempted from the procedural bars of the Mississippi Uniform Post Conviction Collateral Relief Act (UPCCRA). We noted that "[o]ur laws provide that an accused shall have 'representation available at every critical stage of the proceeding against him where a substantial right may be affected.'" *Id.* at 126 (quoting Miss. Code Ann. § 99-15-15 (Rev. 2007)). Post-conviction proceedings are a critical stage of the death-penalty appeal process. *Id.* "PCR counsel's deficient performance cannot preclude the petitioner's opportunity to file meritorious claims for relief." *Crawford v. State*, 218 So. 3d 1142, 1150 (Miss. 2015) (citing *Grayson*, 118 So. 3d at 128).

¶135. Today's partial reversal of *Grayson* leaves death-penalty petitioners with a right to "*competent* and *conscientious*" post-conviction counsel but with no mechanism for petitioning for redress of a viable claim that post-conviction counsel was ineffective. *Grayson*, 118 So. 3d at 126 (citing *Puckett v. State*, 834 So. 2d 676, 680 (Miss. 2002)). This nonsensical outcome violates the maxim that there "is no right without a remedy, for 'whensoever the law giveth any right, . . . it also giveth a remedy.'" *McInnis v. Pace*, 78 Miss. 550, 29 So. 835 (1901) (quoting Co. Litt. 56). The majority characterizes the no-right-without-a-remedy principle as an "ideal" that is "not always attained[.]" Maj. Op. ¶ 24. Yet it discards an ideal we *have* attained in our precedent and have no justifiable reason for abandoning. Starting with *Jackson v. State*, 732 So. 2d 187, 189-90 (Miss. 1999), we held that "recognition of the nature of death penalty litigation in the courts of this state, coupled with the ultimate penalty the State seeks to impose," requires the appointment of post-

conviction counsel even though "[n]othing in the UPCCRA requires that one seeking relief be furnished counsel . . . ."

¶136.  "[D]eath undeniably is different." *Hansen v. State*, 592 So. 2d 114, 142 (Miss. 1991). The right to access the courts is acutely critical under the heightened standards applicable to death penalty proceedings. *Id.* at 125. "This Court recognizes that 'what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.'" *Chamberlin v. State*, 55 So. 3d 1046, 1049-50 (Miss. 2010) (internal quotation marks omitted) (quoting *Flowers v. State*, 773 So. 2d 309, 317 (Miss. 2000)). "[P]rocedural niceties give way to the search for substantial justice, all because death undeniably is different." *Hansen*, 592 So. 2d at 142. "We must resolve all genuine doubts in favor of the accused." *Ronk v. State*, 172 So. 3d 1112, 1125 (Miss. 2015) (citing *Walker v. State*, 913 So. 2d 198, 216 (Miss. 2005)).

¶137.  In *Grayson,* this Court acknowledged that the "State is correct that this Court has not recognized a general right to the effective assistance of PCR counsel in every criminal case. However, we have acknowledged that death-penalty cases are different."*Grayson*, 118 So. 3d at 126. "[B]ecause this Court has recognized that PCR proceedings are a critical stage of the death-penalty appeal process at the state level, today we make clear that PCR petitioners who are under a sentence of death do have a right to the effective assistance of PCR counsel." *Id.* (citing *Jackson*, 732 So. 2d at 191).

¶138.  Because our state law recognizes a right to effective assistance of post-conviction counsel in death penalty cases, Mississippi law should continue to provide access to the

courts to remedy a violation of that right. The majority asserts that we "break no new ground" by denying access to the courts for a death penalty defendant who has received ineffective assistance of post-conviction counsel, and for support cites cases from jurisdictions that—unlike Mississippi—do not recognize the right to effective assistance of post-conviction counsel. *See* Maj. Op. ¶ 28. The majority's assertions amount to a concession that, by eliminating the remedy, this Court's true intent, functionally, is to eliminate the right.[2]

¶139. The heightened standards applicable to death penalty cases have no meaning if the courts are not open for business. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." ***Strickland v. Washington***, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). This Court has extensive precedent granting evidentiary hearings on whether trial counsel was ineffective under the ***Strickland*** standard. *See* ***Spicer v. State***, 973 So. 2d 184 (Miss. 2007); ***Doss v. State***, 882 So. 2d 176 (Miss. 2004); ***Davis v. State***, 743 So. 2d 326 (Miss. 1999); ***Davis v. State***, 743 So. 2d 326 (Miss. 1999); ***Leatherwood v. State***, 473 So. 2d 964 (Miss. 1985).

¶140. In these and other similar cases, post-conviction counsel acted effectively by investigating trial counsel's performance and advocating for their clients in post-conviction proceedings. Under ***Grayson***, we recognized a right to challenge the effectiveness of post-

---

[2] ***Frazier v. State***, 303 S.W. 3d 674, 679 (Tenn. 2010), cited by the majority, is not a death penalty case. That jurisdiction acknowledged that "there are circumstances under which courts must consider the merits of a post-conviction petition even when the petition is filed beyond the statute of limitations" and set reasonable standards for the performance of post-conviction counsel even though the right to post-conviction counsel was statutory rather than constitutional. *Id.* at 679-80.

conviction counsel despite the procedural bars of the UPCCRA. *Grayson*, 118 So. 3d at 128. We granted relief on such a challenge in *Walker v. State*, 131 So. 3d 562, 564 (Miss. 2013), holding that the failure of post-conviction counsel to present a claim of ineffective assistance of trial counsel constituted ineffective assistance of counsel. Walker's trial counsel had failed to research Walker's background, which should have been done to identify mitigation evidence for the sentencing trial. *Id.* at 563. We found that "the mitigation evidence Walker has presented in his petition shows that he potentially was prejudiced by trial counsel's deficient performance at the penalty stage" and that "Walker's claim of ineffective assistance of post-conviction counsel is sufficient to overcome the procedural bars and allow this Court to reach the merits of his claim." *Id.* at 564.

¶141. But now, with no process extant for reviewing the performance of post-conviction counsel, a gap exists for an unjust result to carry through from trial to execution of the ultimate penalty. *See Strickland*, 466 U.S. at 686. Here, the majority goes through the essentially empty motion of analyzing the merits of Ronk's successive post-conviction petition. The crux of today's ruling, however, is that successive post-conviction petitions alleging ineffective assistance of post-conviction counsel are barred.[3] "The denial of an opportunity to present a properly supported motion seeking post-conviction collateral relief is, in effect, the denial of meaningful access to the courts." *Grayson*, 118 So. 3d at 146 (citing *Jackson*, 732 So. 2d at 191).

¶142. The majority compares the absence of a remedy here to other civil limitations such as

---

[3] That is, they are barred under the current provisions of the UPCCRA.

limitations on suits against government entities. Maj. Op. ¶ 24. This comparison is not apt. All civil actions are not the same. In *Jackson*, this Court noted that the UPCCRA followed "the tradition of habeas corpus practice" by providing that motions for post-conviction relief "shall be filed as an original civil action . . . ." *Jackson*, 732 So. 2d at 190 (internal quotation mark omitted) (quoting Miss. Code Ann. § 99-39-7 (Rev. 1994)). Then we qualified that

> [t]hough this Court treats this statutory classification with respect, it is obvious that actions under the UPCCRA, which collaterally attack criminal convictions, are a unique kind of civil action. The reality is that post-conviction efforts, though collateral, have become an appendage, or part, of the death penalty appeal process at the state level.

*Id.* (citation omitted).

¶143. Today's ruling implicates serious due-process concerns and demonstrates why the codification of our common law *habeas* writs in the UPCCRA should be categorized correctly as a procedural enactment. Today's partial overruling of *Grayson* is a sad continuation of this Court's abdication of its essential function as the state's court of last resort. *See Howell v. State*, 358 So. 3d 613, 620 (Miss. 2023) (Kitchens, P.J., dissenting). Following the flawed logic of *Howell*, the majority treats the UPCCRA's bar on successive post-conviction petitions as substantive.

¶144. Prior to *Howell*, this Court unanimously and without controversy categorized the bars of the UPCCRA as procedural, not substantive. *Id.* at 618. We valued the ideal that "[t]o deny relief for a fundamental-rights violation brought to our attention in a successive PCR would ignore the serious due-process concerns underlying the fundamental-rights exception." *Smith v. State*, 149 So. 3d 1027, 1031 (Miss. 2014) (quoting *Rowland*, 42 So. 3d at 507),

*overruled by **Pitchford v. State***, 240 So. 3d 1061 (Miss. 2017). With the Court's abandonment of our decades-long recognition of the fundamental rights exception to procedural bars, we leave death penalty petitioners with no mechanism for out-of-time redress of viable claims. *See **Rowland v. State***, 42 So. 3d 503 (Miss. 2010), *overruled* by *Howell*, 358 So. 3d 613; ***Rowland v. State***, 98 So. 3d 1032 (Miss. 2012), *overruled by Howell*, 358 So. 3d 613. Now, for the scenario of ineffective assistance of post-conviction counsel, petitioners do not even have the option of an on-time petition for redress. The opportunity to seek relief is categorically barred.

¶145. Especially when the ultimate possibility is death, the judicial branch of government is possessed of the obvious and plenary authority to facilitate the redress of violations of fundamental rights. In *Grayson*, we described our judicial function and responsibility thusly:

> Having determined that Grayson had a right to the effective assistance of PCR counsel during his original PCR proceedings, we now must determine whether that right was violated. If it was violated, then Grayson's first PCR motion was a sham, and he was denied an opportunity to present a meritorious PCR motion.

*Grayson*, 118 So. 3d at 126. Today, the Court holds that while we have determined that death-penalty defendants have the right to effective assistance of post-conviction counsel, we will not decide whether that right was violated, we will not determine whether a first post-conviction motion was a sham, and we will not facilitate the opportunity to present a meritorious PCR motion.

¶146. I cannot join this position; therefore, I dissent.

**KING, P.J., AND ISHEE, J., JOIN THIS OPINION.**