DICKINSON, Presiding Justice,
for the Court:
¶ 1. In this murder prosecution, the trial judge ruled in limine that the defendant would not be allowed to support his self-defense claim with evidence of the victim’s prior bad acts, including a violent criminal history. Because the defendant’s knowledge of this evidence would be highly probative of the reasonableness of his conduct and fear of the victim, we reverse and remand for a new trial.
BACKGROUND FACTS AND PROCEEDINGS
¶ 2. Because Rudy Quilon was homeless following his release from prison, Harvill Richardson permitted Quilon to move into his home while he got back on his feet. Over the next five months, Quilon became increasingly unwelcome as he bragged about having been convicted for murder and armed robbery, his previous experiences as a gang member, and killing a “snitch” in prison. He warned that he could harm those who upset him.
¶ 3. On numerous occasions, Richardson attempted to persuade Quilon to leave the home, but Quilon claimed that he could not leave because he had no transportation or place to go. This prompted Richardson to offer Quilon a car and money for rent, but Quilon refused and repeatedly used threats to coerce Richardson and to remain in the home.
¶ 4. This situation culminated when Quilon, who had begun watching pornography on Richardson’s computer, stated that he wanted to have sex with Richardson’s wife. Richardson ordered Quilon to gather his belongings and leave. Quilon refused and walked out to a shed behind the home where Richard kept axes and other tools that could be used as weapons. *840 Richardson then armed himself with a pistol. As Quilon returned from the shed, he approached Richardson in a threatening manner, with one arm concealed behind his back. Richardson attempted to stop him by warning him not to come any closer, and by firing a warning shot into the ground, but Quilon kept coming toward him, so Richardson shot Quilon in the stomach.
¶ 5. Richardson called 911 and informed the dispatcher that he had shot a man named Rudy Quilon in his back yard. Richardson stated that Quilon had come at him in a threatening manner and “kept coming towards me,” and that “I told him don’t come towards me any more.” He told the dispatcher that he had fired one warning shot at the ground, which Quilon ignored, and that Quilon had said “don’t do that, I’ll take care of you.” Expert testimony established that Richardson shot Quilon at close range, “somewhere in the range of 30 inches from the end of the barrel to the man’s skin where the bullet went in.”
¶ 6. Despite Richardson’s version of the facts and claim of self-defense, the State had him indicted for murder and then filed a motion in limine, seeking to prevent him from introducing evidence of Quilon’s prior bad acts. The State argued that the convictions would be improper impeachment evidence under Mississippi Rule of Evidence 609 because they did not involve an element of dishonesty and were more than ten years old, and that the probative value of the convictions was greatly outweighed by the risk of prejudice. And during the pretrial hearing on the State’s motion, the prosecutor moved ore tenus for the trial court to redact from the 911 transcript a reference to Quilon being a felon.
¶ 7. Richardson’s counsel responded by making it clear that he did not intend to use Quilon’s prior bad acts, including his convictions, for impeachment purposes.[1] Instead, he pointed out that the evidence of Richardson’s knowledge of Quilon’s violent criminal history was critical to his defense and was necessary for the jury to assess the reasonableness of his actions on the night of the shooting.
¶8. Also, Richardson’s counsel played the recording of the 911 call for the trial judge and then argued:
[Ajbout midway through the transcript, she [the 911 operator] says did he have a weapon, and he says what? She said, you just said you shot a man, did he have a weapon? And he was trying to explain that he was coming at him in a threatening way, and that he said don’t do that, I will take care of you. And by that he means, and at that point that goes back to his criminal felony convict mentality and the way they act. “I’ll take care of it,” means like when he was a convict and he would brag about it. He would say things like. They wanted me to kill this person and take a hit out and I took care of it. I’ll take care of this. Taking care of it wasn’t just a kind expression of intent to do something innocuous [sic]. It was a menacing threatening thing coming out of his mouth. When he took care of something, it had a lot more emphasis and intent. It was a very loaded statement that required explanation.
¶ 9. Instead of responding to Richardson’s argument, the State returned to its Rule 609 argument concerning impeachment, after which the trial judge granted the State’s motion in limine without reservation, stating “with regard to the state’s motion in limine to exclude the victim’s *841 priors, which also included, ore tenus, a portion of the 911 tape .... [t]hat motion is sustained or granted.”
¶ 10. Defense counsel then voiced concern as to whether the trial judge’s ruling merely prohibited reference to Quilon’s convictions or also precluded the defendant’s testimony that Quilon had bragged about his crimes to instill fear in the defendant, which affected his state of mind on the night of the killing. The trial judge noted the necessity of showing an overt act before the victim’s propensity became relevant. Defense counsel responded that the trial judge had heard sufficient evidence of an overt act.
¶ 11. The trial judge did not address or assess Richardson’s argument. Instead he referred back to Rule 601’s impeachment standard, stating that Quilon’s convictions were too remote in time to be relevant and that their probative value was outweighed by their prejudicial impact. Defense counsel then proffered Richardson’s testimony, which included his account of how Quilon had bragged about his violent past to instill fear in Richardson as a means of manipulation. Richardson also explained the reasons why he had sought to remove Qui-lon from his home on the night of the killing, and how Quilon had come out of the storage shed with his hand concealed behind his back, advancing toward him and refusing to stop, even after Richardson verbally had warned him and had fired a warning shot into the ground.
¶ 12. After hearing Richardson’s proffer, the trial judge stated that his original ruling would stand. Richardson was tried and convicted of murder.
ANALYSIS
¶ 18. We review the trial judge’s decision to admit or exclude evidence for an abuse of discretion,[2] but we apply de novo review to a trial judge’s analysis and application of the law.[3] The State’s erroneous argument concerning Rule 609 needs little analysis. Rule 609 allows a party, within certain limits, to use a witness’s prior criminal convictions to impeach the credibility of that witness.[4] Since Quilon was dead, he was not going to be a witness, so Rule 609 had no application whatsoever to his prior bad acts. The trial judge committed error in applying Rule 609. But, even if the trial court had based his ruling on the law related to use of a victim’s criminal history in self-defense cases, his ruling still would have been incorrect.

Quilon’s prior bad acts were relevant and admissible.

¶ 14. Evidence with “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence” is relevant.[5] “All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Mississippi, or by” the rules of evidence.[6]
¶ 15. Although relevant, character evidence — also referred to as prior bad acts — may not be used “for the purpose of proving that [a person] acted in conformity *842 therewith on a particular occasion.”[7] But this rule has several exceptions, one of which is “[e]vidence of a pertinent trait of character of the victim of the crime offered by an accused....”[8] Another exception is where the evidence is not offered for character purposes, but rather for some other purpose.”[9] In this case, both exceptions apply.
¶ 16. Rule 404(a)(2) — which allows a defendant to admit evidence of a “pertinent trait of character of the victim of the crime” — applies on its face. The character trait at issue — violence—is certainly “pertinent” to Richardson’s claim of self-defense. And Rule 404(b) — which allows character evidence to be introduced for “other purposes” — applies because Richardson clearly and forcefully attempted to use the prior criminal history, not to show propensity, but to show his state of mind, that is, that at the time of the shooting, he feared Quilon, and that his fear was reasonable.
¶ 17. Murder requires deliberate design.[10] A killing in self-defense requires an objectively reasonable belief that lethal force was necessary to prevent death or serious bodily harm.[11] Richardson’s claim of self-defense not only allows, but requires evidence of the defendant’s state of mind at the time of the killing. So, evidence showing Richardson’s knowledge of Quilon’s prior violent criminal history was quite clearly relevant under Rule 401’s standard and admissible under the standards of Rule 404(a)(2) and Rule 404(b).
¶ 18. Prior to our adoption of the rules of evidence, our cases held that, “[o]rdi-narily the character or reputation of the deceased person is not involved as part of the issue in a murder case, and proof relative thereto is generally inadmissible.” [12] This holding was predicated on the view that the unprovoked killing of a bad person is no less murder than the unprovoked killing of an innocent one.[13] And before the accused could present evidence of the victim’s bad character, self-defense had to be at issue.[14] Self-defense was not considered to have been at issue until the defendant produced some evidence of an overt act by the victim that could be construed as aggression.[15] These holdings were designed to accomplish today’s Rule 401 and 404 purposes.
¶ 19. Today, the admissibility of evidence is controlled by the Mississippi Rules of Evidence,[16] which include no specific requirement of an overt act. But even assuming our rules included the requirement of an overt act of aggression, there was ample evidence for the jury to *843 find one here. Through Richardson’s testimony and the 911 recording, Richardson stated several times that Quilon had emerged from the shed and had kept coming towards him in a menacing way, despite repeated warnings to stop. Richardson added that Quilon was coming from a storage shed and had concealed his left hand behind his back. And the evidence clearly established that Richardson did not shoot Quilon until the two were in close proximity.
¶ 20. So, even were we to apply our pre-rules caselaw, the trial judge should have allowed Richardson to introduce evidence of his knowledge of Quilon’s violent criminal history. The dissent seems to believe that the trial judge would have allowed Richardson to testify about his knowledge of Quilon’s criminal conduct and violent past. Nothing in the trial judge’s rulings suggests this is so. Indeed, after the trial judge granted the State’s motion to exclude evidence of Qui-lon’s violent past, Richardson proffered the testimony he "wished to provide concerning his fear of Quilon because of his violent past. At the conclusion of the proffer, the trial judge reaffirmed his ruling excluding the evidence:
The court’s ruling remains. I will also note that the defendant stated that the last statement to that effect allegedly made by the victim was days before the incident for the basis of the indictment that we are here for today. So based on the remoteness of time, as well as the prejudicial effect, the ruling stands.
¶ 21. At no point did the trial judge ever indicate he would allow Richardson to testify about Quilon’s violent past. To the contrary, the trial judge made it quite clear that he would not allow Richardson to testify about Quilon’s threats and his knowledge of Quilon’s violent history. Defense counsel then engaged in the following exchange with the trial court:
MR. CROSBY: To what extent will I be allowed to say about his state of mind concerning any bad behavior, not the specifics, but the fact he was a bad guy or he would use—
THE COURT: Yet again, I "will defer to our Supreme Court that stated whether a victim is a good guy or bad guy, it’s irrelevant to the crime. Whether a good man dies or a bad man dies is irrelevant to the charge of the offense.
MR. CROSBY: It is irrelevant he told Mr. Richardson he is [a] bad guy as a way of intimidating Mr. Richardson and to allow him to stay longer?
THE COURT: There may be some relevance, but it is greatly outweighed by the prejudicial effect. And will serve only to confuse this jury.
MR. CROSBY: So I can’t say that he intimidated Mr. Richardson by bragging about anything in the past criminally?
THE COURT: Now that’s a gross generalization. What I’m not going to allow you to bring forth to this jury is the fact that this victim alleged to be a gang member in San Diego.... That he had killed a cell mate by throwing him to the ground and strangling him. And that he had executed a young lady because she was a snitch. Anything further, [Sjtate?
¶ 22. We find the trial court’s ruling to have been quite clear. Richardson was not going to be allowed to present evidence of Quilon’s violent history, either through his own testimony or otherwise.
¶ 23. Due to the importance of the defendant’s state of mind in a self-defense case, the trial judge’s erroneous decision to exclude this evidence significantly ham *844 pered Richardson’s ability to present a defense, so we must reverse.[17]
CONCLUSION
¶ 24. The State incorrectly argued that Quilon’s violent criminal history was precluded by Rule 609 — a rule that applies only to impeachment of witnesses. The trial judge committed reversible error by refusing to allow Richardson to defend himself with evidence that tended to show his state of mind at the time of the killing. This evidence was crucial to Richardson’s claim of self defense. We therefore must reverse Richardson’s conviction and remand for a new trial.
¶ 25. REVERSED AND REMANDED.
RANDOLPH, P.J., LAMAR, KITCHENS, KING AND COLEMAN, JJ„ CONCUR. PIERCE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., AND CHANDLER, J.

. Indeed, that would have been impossible. Rule 609 applies only to impeachment of a witness, and Quilon (who was dead) was not going to be a witness.

. Outerbridge v. State, 947 So.2d 279, 282 (Miss.2006) (citing Johnston v. State, 567 So.2d 237, 238 (Miss.1990)).

. Smith v. Hollins, 905 So.2d 1267, 1270 (Miss.2005).

. M.R.E. 609.

. M.R.E. 401.

. M.R.E. 402.

. M.R.E. 404(a).

. M.R.E. 404(a)(2).

. M.R.E. 404(b).

. Miss.Code Ann. § 97-3-19 (Rev.2006).

. Hart v. State, 637 So.2d 1329, 1340 (Miss. 1994).

. Shinall v. State, 199 So.2d 251, 257 (Miss. 1967), overruled on other grounds by Flowers v. State, 473 So.2d 164, 165-66 (Miss.1985).

. Shinall, 199 So.2d at 257 (citing Spivey v. State, 58 Miss. 858 (1881); Chase v. State, 46 Miss. 683 (1872); Jolly v. State, 13 Smedes & M. 223, 1849 WL 2322 (1849); Dowling v. State, 5 Smedes & M. 664, 1846 WL 1617 (1846); 40 CJ.S. Homicide § 222 (1944)).

. Shinall, 199 So.2d at 257 (citing Spivey, 58 Miss. at 858; Moriarty v. State, 62 Miss. 654, 661 (1885); Smith v. State, 75 Miss. 542, 23 So. 260 (1898); Anderson v. State, 181 Miss. 300, 179 So. 560 (1938); Wesley v. State, 37 Miss. 327, 346 (1859)).

. Shinall, 199 So.2d at 258.

. Order Adopting the Mississippi Rules of Evidence (Sept. 24, 1985); see also M.R.E. 1101.

. The dissent claims it does "not read the trial court’s pretrial ruling as refusing to allow Richardson to defend himself with evidence that tended to show his state of mind at the time of the killing.” And then it says: "Clearly, what the State sought to prevent, however, was nonevidentiary, prejudicial remarks about Quilon's past being improperly interjected into the case.” We find these two statements to be inherently contradictory.