# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00257-COA

**DEMONTE LEVELLE WILLIAMS A/K/A**     **APPELLANT**
**DEMONTE L. WILLIAMS A/K/A DEMONTE**
**WILLIAMS**

**v.**

**STATE OF MISSISSIPPI**           **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/16/2023 |
| TRIAL JUDGE: | HON. CHRISTOPHER LOUIS SCHMIDT |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | MADELINE MARCANTEL ILES JONATHAN MATTHEW EICHELBERGER |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JULIANNE KAY BAILEY KATY TAYLOR SARVER |
| DISTRICT ATTORNEY: | W. CROSBY PARKER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/04/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WESTBROOKS, P.J., McDONALD AND LASSITTER ST. PÉ, JJ.**

**WESTBROOKS, P.J., FOR THE COURT:**

¶1. Demonte Williams was indicted and tried for first-degree murder in the shooting death of Brent Jones. Following a jury trial, Williams was convicted of the lesser-included offense of manslaughter and sentenced to serve twenty years in custody. On direct appeal, Williams argues that the trial court erred in limiting evidence related to the character of the victim. Finding no reversible error, we affirm the conviction and sentence.

## FACTS AND PROCEEDINGS BELOW

*Arguments between the Victim and Williams Before the Day of the Shooting*

¶2.     Williams shares two children with Tatayana Badon, who was engaged to Brent Jones at the time he was killed. According to Williams, approximately two months before the shooting, Brent displayed a gun during a custody exchange and told Williams to stop coming to pick up the kids because "the kids are not my kids, they're his kids." Following this encounter, Williams bought a gun and kept it with him at all times. On Friday, June 11, 2021, Williams and Tatayana had an argument over the phone about co-parenting. Brent, who was present with Tatayana, joined in the argument. Following the argument, Tatayana made a Facebook post directed at Williams "about being more present in his children's life." Williams and Brent then exchanged a series of escalating threatening comments.

¶3.     One of the comments made from the Facebook account associated with Brent stated, "On six yo momma gonna get slapped and come show me you stated told you but you ain't can't dish it stop talkin show me show me." Other comments from that account stated, "Demonte Williams boy they know u ain't but nun of that just left yo moma house," and "Demonte Williams WHAT THE F*** THEY GON DO BESIDES SIT BY YO GRAVE SITE." Williams lived with his mother, Greatta Hodges. Greatta was extremely concerned about the threats from Brent, and because the threats referenced her and because Brent stated he had come by her house, Greatta filed a report with the Harrison County Sheriff's Office.

*Shooting at O'Reilly's Auto Parts*

¶4.     The following Monday morning, on June 14, 2021, Brent took Tatayana's car to O'Reilly's Auto Parts in Gulfport to have the check engine light diagnosed.  Parts salesman

2

Bruce Simmons was in the parking lot with Brent examining Tatayana's car when, as shown by surveillance video from a nearby church, Williams drove past the business and then made a U-turn to return to the store. According to Williams, he came to O'Reilly's because he specifically wanted to buy Meguiar's Tire Shine, and the first store he went to did not have that brand in stock. He was distracted on his phone and missed the entrance to the parking lot, which is why he had to make a U-turn. Assistant manager Tristan Krohn testified that Williams browsed cleaning products and asked Krohn for a recommendation. Krohn recommended the Meguiar's brand. According to Krohn, Williams did not ask for a specific item. Williams was at the third register from the door paying for his purchase when Simmons and Brent returned from the parking lot. According to Simmons, Brent stopped in the doorway when he noticed Williams standing about twenty feet away and became agitated. Brent and Williams were never closer than that distance from each other during the course of events.

¶5.    According to Williams, Brent entered O'Reilly's and "told me to call my mom, to tell her to have my headstone ready because somebody is not going to leave this parking lot." Brent then went outside and paced back and forth. Williams testified that after Brent made these comments, he (Williams) called his mother to come pick him up because he could not leave with Brent between him and his car. Williams testified that Brent came back into the store "with tears in his eyes crying saying – you know, saying come on outside, that he put that on his dead brother that somebody has got to die today, you know. Like, he specifically told me that, that somebody is not about to leave the parking lot alive. That specifically came

3

from out his mouth." Williams also testified that while making these statements, Brent raised his shirt up twice to intimate that he had a gun.

¶6.     Simmons heard Brent say something about a brother and the phrase "we can handle this right now." While Simmons did not hear Brent explicitly threaten Williams, he testified that Brent was the one being confrontational. Krohn also heard Brent make a reference to his "brother." Neither observed Brent raising his shirt. Simmons observed Brent returning to the parking lot and pacing between his car and Williams' car. Then, Brent went to Williams' car and snatched the locked car door open, breaking the handle. Krohn heard Williams ask, "[D]id he just get in my truck?" Williams then kicked the store door open and fired four shots. Williams was crossing the threshold of the door when the first shot was fired. Williams said that he saw Brent on the phone, which made Williams "afraid that he was calling his people," and that this made him feel "scared for my life because I already had done went to the cops. You know, my mom already had went to go try and make a police report."

¶7.     The medical examiner testified that the two bullets that struck Brent went through the back of his left leg and the back left side of his head. According to Simmons, when the shots were fired, Brent had the door to Williams' car open and was facing toward the inside of the car. According to Krohn, Brent had gotten in the car and was in the process of getting back out of the car and turning back to face the inside of the car as the shooting began. He testified that at the moment of the first shot, Brent was facing the inside of the truck. According to Williams, shortly before the shots were fired, Brent was facing him, getting out of the car with one foot in and one foot out. He saw Brent making a flinching motion like he was about

4

to shoot, so Williams closed his eyes and began shooting. Williams acknowledged that while he believed Brent had a gun, he did not actually see a gun. No firearms were discovered near the victim.

¶8.     Greatta testified that Williams called her from the store to tell her that Brent was threatening him, and the line was active during most of the encounter. Phone records show multiple short calls between her and Williams during this time, including brief FaceTime calls because Greatta was trying to witness what was happening. Greatta left her home and began driving toward O'Reilly's. Williams discarded his gun over a fence at a business across the street. Using her share location app, Greatta found Williams in a nearby residential area and drove him over two hours away to Tylertown to stay with her sister while Greatta could find an attorney for Williams. Accompanied by his attorney, Williams turned himself in to the police later that day.

*State's Motion in Limine*

¶9.     Before trial, the circuit court heard the State's motion in limine to exclude character evidence of the victim. The State said that it would not object to Williams testifying about direct threats Brent made to Williams if a proper foundation was laid. But the State sought to exclude "generalized statements such as the victim was a gang member or he had committed a specific act of violence against a specific person that is not a party to this case until an overt act is established . . . ." The State also argued that only "once an overt act of aggression is established, defense may call other witnesses to testify about threats of violence by the victim against them or any other bad acts with which those witnesses have actual

5

personal knowledge of." The court ruled that generalized evidence of Brent's gang affiliation and criminal history would not be admissible, but prior bad acts, such as threats, could come in through the direct testimony of the defendant if the defense presented evidence of an overt act of aggression by the victim.

*Tatayana's Trial Testimony about Threats Between the Victim and Williams*

¶10.   At trial, Tatayana was asked on direct examination about the back-and-forth comments Brent and Williams made on her Facebook post. She said that the comments included threats. When asked what type of threats were made, she said that Williams told Brent that "he's going to put him where his [deceased] brother is" and tagged family members. Tatayana deleted this particular comment from her post. When asked on cross-examination if she agreed that Williams had made threats to Brent, she responded, "Both ways. Yes." And she said that "[t]hey both [were] threatening to kill each other." The defense sought to enter screenshots of the Facebook comments to Tatayana's post. Tatayana confirmed the name of Brent's Facebook account. The court did not permit screenshots of the comments to be admitted through Tatayana, agreeing with the State's argument that she did not have personal knowledge of the threats.[1]

*Williams' Trial Testimony about Brent's Character*

¶11.   The court did permit Williams to testify before the jury about the content of Facebook threats, including the comment that "On six yo momma gonna get slapped . . . " and

---

[1] Many of the Facebook comments had been deleted, in places creating the appearance that Brent was having a conversation with himself. The State argued that the screenshots were more prejudicial than probative and that they would confuse the jury because it was an incomplete conversation that could not be properly authenticated.

"Demonte Williams what the f*** they gon do besides sit by yo grave site" and that Brent "just left yo moma house." However, the court restricted the defense witnesses from any reference to gang affiliation, denying Williams' request to testify that the expression "on six" was gang slang meaning that Brent would be kicked out of the gang if he did not go through with the threat. When asked what he took the slapping comment to mean, Williams said, "I know that he deals with guns . . . so from him saying 'slap' – like, hit her with a gun or try to, you know, like hurt her. That's a threat." When asked what Brent meant by referencing a tombstone, Williams said that "the only way to have a tombstone is if you deceased." And when asked about Brent's comment that he had been to Greatta's house, Williams said "[T]hat's a deadly threat. He was going to try to do something then, but I wasn't at home."

¶12.    Williams also testified that in the months before the shooting, at custody exchanges, Brent displayed a gun and made "deadly" threats to him and his mother, and Williams said, "I took them seriously to where I was scared for my life." He believed that Brent was the kind of person who would act on the threats. He testified that his mother filed the police report on their behalf. He described his recollection of the day of the shooting, including that Brent "told me to call my mom, to tell her to have my headstone ready because somebody is not going to leave this parking lot" and that Brent "put it on his dead brother that somebody is about to die today right here."

¶13.    Williams testified that he went outside the store because, in addition to Brent forcibly opening Williams' car door, Williams saw Brent on his phone. Following the court's instructions to not use the word "gang," he testified, "I was afraid that he was calling his

7

people . . . that had me scared—you know, scared for my life because I already had done went to the cops . . . . [T]hat's when I was calling my mom to come help me, to come pick me up, you know, because I didn't want, you know, nothing to happen." He got his gun out because his "plan was to try to scare him so I could leave because I couldn't leave." Then he thought Brent was reaching for a gun, so Williams closed his eyes and began shooting.

*Greatta's Trial Testimony about Brent's Character*

¶14.    Greatta testified that in the months before the shooting, "we were receiving numerous threats about what was going to happen as soon as [Brent] saw us." The Facebook message about Brent coming to her house "scared me . . . and I went to the police, and I showed them on my phone, and I told them that I was scared." She stated further that over the weekend between the Facebook threats and the day of the shooting, "We was very afraid. We was afraid for our life. We was scared, very scared. I couldn't even—I couldn't hardly even sleep." She testified that on the day of the shooting, when Williams called her from the store, she put her phone on speaker phone so her husband could also hear, and Williams told her that Brent was in the store. Williams said, "[H]e's trippin'. He's telling me to call my family, to have my momma to get my headstone together because one of us not gonna leave here alive." And a little later she heard him say, "No, man, please don't do this. Please don't do this." Then she heard a gunshot.

¶15.    When asked why she drove Williams to Tylertown, she explained that she wanted to get him to "safety." When asked what she meant by safety, she said, following the court's instructions to not use the word "gang," "Brent and his associates already knew where I

8

lived, so I knew it wasn't safe to be there to even wait to get him turned in . . . . I never tried to elude the police. I only tried to get my son to safety to get him turned in . . . . There's a lot of associates, and we were scared. We wanted to go in with counsel."

*Greatta's Rejected Proffer of Brent's Gang Affiliation*

¶16.    Outside of the presence of the jury, the court heard Greatta's proffered testimony that Brent was in a gang and that she and Williams were afraid of retaliation. She proffered in part:

> WITNESS:    He's in a gang. He was in a gang, and we were very afraid of them, and he made it very clear to us that he was high-ranked in the gang. Tatayana also always told us what they would do to us. So I was scared.

The court rejected the proffer as inadmissible evidence.

¶17.    The jury was instructed on first-degree murder, self-defense, and manslaughter (both heat-of-passion and imperfect self-defense). The jury found Williams guilty of manslaughter.

¶18.    Williams now appeals.

## STANDARD OF REVIEW

¶19.    We review the trial judge's decision to admit or exclude evidence for an abuse of discretion, but we apply de novo review to a trial judge's analysis and application of the law. *Richardson v. State*, 147 So. 3d 838, 841 (¶13) (Miss. 2014).

## DISCUSSION

¶20.    Williams' arguments on appeal center on an assertion that the circuit court unduly limited evidence of the victim's prior bad acts and propensity for violence, preventing Williams from presenting necessary evidence of his state of mind at the time of the shooting.

9

In particular, Williams argues that the court erred in announcing that evidence of "an overt act" of aggression is required before such evidence is admissible and that evidence of Brent's gang affiliation should have been admitted. Generally, under Mississippi Rule of Evidence 404(a)(1), "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." However, exceptions apply. Under Mississippi Rule of Evidence 404(a)(2)(B), "a defendant may offer evidence of an alleged victim's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it[.]" And Rule of Evidence 404(b) states:

> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

¶21.     A claim of self-defense "not only allows, but requires evidence of the defendant's state of mind at the time of the killing." *Richardson v. State*, 147 So. 3d 838, 842 (¶17) (Miss. 2014); *see also Bell v. State*, 303 So. 3d 22, 27 (¶17) (Miss. Ct. App. 2020). In *Richardson*, the Mississippi Supreme Court reversed a first-degree murder conviction because the trial court improperly excluded the defendant's knowledge of the victim's violent criminal history. *Id.* at 844 (¶24). The defendant's knowledge of the victim's violent criminal history "was critical to his defense and was necessary for the jury to assess the reasonableness of his actions on the night of the shooting." *Id.* at 840 (¶7). The victim had been recently released from prison after serving sentences for murder and armed robbery. *Id.*

at 839 (¶3). Richardson permitted the victim to temporarily stay at his family's house, but the victim refused to leave, bragged about his violent past, and used threats to remain in the home. *Id.* at (¶3). Richardson shot the victim after he announced his desire to sleep with Richardson's wife and advanced on Richardson while pretending to hide a weapon behind his back. *Id.* at 839-40 (¶4). The court held that "Richardson clearly and forcefully attempted to use the prior criminal history, not to show propensity, but to show his state of mind, that is, that at the time of the shooting, he feared [the victim], and that his fear was reasonable." *Id.* at 842 (¶16).

¶22.    *Richardson* discussed the long-standing requirement that the defendant show an "overt act by the victim that could be construed as aggression" before allowing evidence of the victim's character. Before the adoption of the Mississippi Rules of Evidence, "[s]elf-defense was not considered to have been at issue until the defendant produced some evidence of an overt act by the victim that could be construed as aggression." *Id.* at 842 (¶18). However, *Richardson* states that "[t]oday, the admissibility of evidence is controlled by the Mississippi Rules of Evidence, which include no specific requirement of an overt act." *Id.* at 842 (¶19). But the opinion also held that on the facts of that case, "there was ample evidence for the jury to find" an overt act and reversed the conviction. *Id.* at 842-43.[2]

¶23.    The State argues that the "overt act" requirement has not been clearly abrogated and that, regardless, the relevancy requirement is still applicable before a victim's character is admissible. The mere presence of a victim about whom the defendant has knowledge of prior

---

[2] On retrial, Richardson was found not guilty.

11

bad acts does not operate to justify preemptive self-defense. Moreover, the State argues that in Williams' case, the jury ended up largely hearing the substance of the character evidence despite the restrictions imposed by the circuit court, and therefore any incorrect statements of law announced by the court and accompanying limitations on evidence did not result in an unfair trial or have a prejudicial impact on Williams' ability to present evidence of his state of mind.

¶24. It may still be unclear post-*Richardson* whether the "overt act" requirement has been formally abrogated by and subsumed in the function of the Rules of Evidence. *See Richardson*, 147 So. 3d at 842 (¶18) ("These [overt act] holdings were designed to accomplish today's Rule 401 and 404 purposes."). This Court has described the requirement as "relaxed." *Dille v. State*, 334 So. 3d 1162, 1187 (Miss. Ct. App. 2021); *see also Jordan v. State*, 211 So. 3d 713, 717 (¶15) (Miss. Ct. App. 2016) ("[T]he supreme court has recently suggested that the requirement has been abrogated by the adoption of the Rules of Evidence.").[3] The comments to the Rules of Evidence still refer to the overt act requirement. *See* MRE 404 cmt. ("In order to prove [relevance of the character of victim,] the defendant must offer evidence of an overt act perpetrated against him by the victim[.]").

¶25. However, even when the trial court errs in refusing to allow character evidence, reversal is not warranted "unless it affects a substantial right of a party." *Jordan*, 211 So. 3d

---

[3] It is also a closer question in this case than in *Richardson* that, "assuming our rules included the requirement of an overt act of aggression, there was ample evidence for the jury to find one here." In *Richardson*, the victim was advancing on the defendant in close proximity, had his hand behind his back, had just come from a shed that stored axes and other sharp implements, and refused to stop advancing when the defendant fired a warning shot.

12

at 717 (¶18). "The refusal of evidence of the character of the victim affects the defendant's right to a fair trial; and thus reversal is required unless 'on the whole record, the error was harmless beyond a reasonable doubt.'" *Id.* (quoting *Newsom v. State*, 629 So. 2d 611, 614 (Miss. 1993)). In *Jordan*, the defendant was convicted of aggravated assault after shooting his girlfriend's ex-boyfriend. According to the defendant and his girlfriend, the victim had been conspicuously carrying a pistol in his waistband and appeared to be preparing to shoot after getting angry and threatening to kill them. *Jordan*, 211 So. 3d at 715 (¶4). This Court reversed the conviction, finding that the trial court erred in excluding the girlfriend's testimony that the victim had been abusive, that he had been a "kingpin" of a gang, that she had told Jordan to leave the scene because she expected the gang to retaliate, and that Jordan was aware of the victim's history and afraid of him as a result. *Id.* at (¶¶1, 8). In analyzing whether the error in refusing to admit this evidence could be harmless error, we noted that "the jury was permitted to hear very little of the substance of the proffered testimony" through other evidence that was admitted, and that the testimony that was presented was "sharply conflicting." *Id.* at 718 (¶19).[4]

¶26.    Here, looking to the question of whether the court's rulings "[s]ignificantly hampered [the defendant's] ability to present a defense[,]" we cannot say that any errors in limiting evidence of Brent's character affected Williams' right to a fair trial warranting reversal of his manslaughter conviction. *See Richardson*, 147 So. 3d at 843-44 (¶23). Unlike in *Jordan*, in which we stated that "the jury was permitted to hear very little of the substance of the

---

    [4] On retrial, Jordan was found not guilty.

proffered testimony," the jury heard Williams testify extensively about threats made by Brent and Williams' fear of Brent. He testified that two months before the shooting, Brent displayed a gun at a custody exchange and made "deadly threats." While the substance of Brent's Facebook threats was not admitted through Tatayana, the jury heard Williams discuss the specific Facebook threats made on the Friday before the shooting, including the comment that Brent had been to his mother's house and the threat that his mother would get "slapped" and that he understood that to be a threat of violence. The jury heard both Williams and Greatta testify that they filed a police report in response to these threats. They testified repeatedly that these threats made them afraid and scared for their lives.

¶27. The jury heard Tatayana's testimony that Williams and Brent were threatening to kill each other. Williams testified about the specific statements Brent made to him on the O'Reilly's premises in the moments before the shooting, including that his mother needed to get his tombstone ready and that Brent "put it on his dead brother that somebody is about to die today right here." He testified that Brent was blocking his access to his vehicle and that he thought Brent was calling his "people" to come to O'Reilly's. Greatta testified about her fear of Brent and his "associates," and that she was afraid for their lives. She was afraid that the many "associates" would come to her home.

¶28. The jury heard evidence of Williams' state of mind and how it was influenced by his knowledge of Brent's character, and the jury returned a verdict of manslaughter.

**CONCLUSION**

¶29. Defendants are entitled to present evidence of their state of mind when presenting a

14

claim of self-defense. Here, looking to the "evidence that was admitted" and to "the record as a whole," we find that any error in limiting evidence of Brent's character was harmless in light of the other evidence that was admitted.

¶30. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., McDONALD, LAWRENCE, McCARTY, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WILSON, P.J., AND EMFINGER, J., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**